UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSS HATHAWAY,<br><br>Plaintiff,<br><br>v.<br><br>IDAHO PACIFIC CORPORATION,<br><br>Defendant. | Case No. 4:15-cv-00086-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff Ross Hathaway's Motion to Amend to Seek Punitive Damages Pursuant to Idaho Code § 6–1604 ("Motion").[1] Dkt. 145. Defendant Idaho Pacific Corporation ("IPC") opposed the Motion.

Oral argument on this Motion was heard September 25, 2019. At the conclusion of oral argument, the Court granted the motion; however, the Court also explained its desire to issue a formal ruling memorializing its decision. Accordingly, as was stated on the record, and for the reasons discussed below, the Court GRANTS Hathaway's Motion.

## II. BACKGROUND

On February 19, 2013, Hathaway claims to have slipped on potato granules, causing him to fall and injure his left thumb, hand, and shoulder. Hathaway reported the accident to Dwain Gotch, IPC's Plant Safety Manager. Gotch prepared a handwritten report

---

[1] Also pending are IPC's Motion to Strike (Dkt. 172) and Motion to Expedite (Dkt. 173). The Court mooted these motions when it continued trial from June 3, 2019 to October of 2019. However, no official ruling was made. This order officially moots them.

detailing the accident, which Hathaway reviewed and signed ("Handwritten Report").

About a month later, on March 21, 2013, Hathaway went to Community Care, IPC's workers' compensation provider, after he experienced pain in his shoulders. This pain caused his arm to seize up while he was at work. On March 22, 2013, Dr. Larry Curtis informed Hathaway he had a shoulder strain from the February 19, 2013, fall. Lorina Steele, IPC's human resources administrator, received this information on the same day but believed Hathaway's pain and arm-seizure were caused by hyperglycemia. Because of this belief, she responded by telling Community Care that this injury was not workers' compensation related.

On March 28, 2013, Dr. Curtis sent a letter to Steele stating he "fe[lt] strongly that [Hathaway's injury] is work comp related." Dkt 145-8. The next day, Steele prepared a workers' compensation report ("First Report") and sent it to Liberty Mutual, IPC's insurer, along with the medical documentation she had received from Community Care. In the First Report, Steele did not include any information regarding Hathaway's shoulder injury. In an email to Liberty Mutual, Steele stated she didn't know how to complete a report for Hathaway because she believed the March 21, 2013, arm seizure was not related to his prior work injury.

Around mid-April of 2013, a co-worker informed Hathaway that IPC omitted his shoulder injury from their records. When Hathaway inquired about the omission, Gotch provided him a copy of an unsigned, typed report in place of the Handwritten Report. This typed report included only his thumb injury and did not reference his shoulder. Gotch told Hathaway to see Mike Willmore, another supervisor, about any concerns he had regarding

the shoulder injury or Handwritten Report. On April 17, Hathaway met with Willmore to discuss his concerns. On April 18, IPC fired Hathaway, claiming he told another employee he would intentionally hurt himself at work. Hathaway was not given an opportunity to respond to those allegations.

### III. LEGAL STANDARD

Hathaway seeks to amend his Complaint to add a claim for punitive damages on his state cause of action. Typically, in federal court, a motion to amend is governed by Rule 15 of the Federal Rules of Civil Procedure, which provides a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, however, the federal standard must be balanced with the limiting provisions of Idaho statutory and case law. *Strong v. Unumprovident Corp.*, 393 F. Supp 2d 1012 at 1025 (D. Idaho 2005) ("[A] claim for punitive damages is substantive in nature and accordingly is controlled by relevant Idaho case law.").

Punitive damages are disfavored under Idaho law and should be awarded in only the most "unusual and compelling circumstances." *Cusack v. Bendpak, Inc*., No. 4:17-CV-00003-DCN, 2018 WL 1768030, at *4 (D. Idaho Apr. 12, 2018) (quoting *Seiniger Law Office, P.A. v. N. Pac. Ins. Co*., 178 P.3d 606, 614 (Idaho 2008)). Under Idaho Code section 6–1604, a "claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." Idaho Code § 6–1604(1) (2010). A claim for punitive damages cannot be made in the original complaint but must be brought in a pretrial motion. *Id.* at §6–1604(2). After conducting a hearing, a court may grant leave to add a claim for punitive damages "if, after

weighing the evidence presented, the court concludes that the moving party has established . . . a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *Id.* Thus, a court need not determine that the movant has established clear and convincing evidence, but instead focuses on if there is a reasonable likelihood of doing so at trial. *Id.*

This can be summed up as a two-part inquiry. First, a defendant's conduct must rise to the level of oppressive, fraudulent, malicious, or outrageous conduct. *Id* at § 6–1604(1). This requires an "intersection of two factors: a bad act and a bad state of mind." *Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004) (internal quotations omitted). Put differently, a defendant must "act[] in a manner that was an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." *Id.* If a defendant's actions do not meet this high threshold, there can be no award of punitive damages.

Second, a plaintiff must establish a reasonable likelihood of proving that a defendant acted in such an outrageous manner. Idaho Code §6–1604(2). This requires a plaintiff do more than simply allege extreme conduct. It necessitates evidence, direct or circumstantial, that a defendant acted in a punitive manner. After a court examines all the evidence, if it finds there is a reasonable likelihood that a plaintiff can prove what he claims, then the court shall grant the motion to amend the pleadings to include a claim for punitive damages. *Id.*

# IV. ANALYSIS

## A. Preliminary Matters

IPC argues that Hathaway is procedurally barred from asserting punitive damages at this stage because (1) the law requires his Motion to be brought pretrial, and since trial already happened his Motion is untimely; and (2) he waived his opportunity to bring a state-law claim for punitive damages when he asked for only federal-law punitive damages when the case was submitted to the jury in the first trial. The Court is not persuaded by either argument.

First, Hathaway bases his Motion in part on evidence that was adduced at trial, namely Steele's misstatement and the fact that she possessed his medical documents before she made the First Report. Thus, that information was not available to him prior to the first trial commencing. Though there is no direct legal precedent known to the Court regarding a motion pursuant to Idaho Code section 6–1604 made after a mistrial, the Court uses its discretion to allow Hathaway to bring this Motion. *See Dowling v. Am. Haw. Cruises, Inc.*, 869 F. Supp. 806.

As to the second argument, a review of the record shows neither Hathaway, nor IPC, discussed state-law punitive damage claims at the previous trial. Instead, it was determined that Hathaway was not going to seek punitive damages under both his ADA and IHRA claims, but just the ADA claims. There is no legal requirement to discuss both state and federal law claims for punitive damages together, especially when at the time only one was sought. Under the facts and circumstances, it cannot be said that Hathaway made a knowing waiver of a claim for punitive damages under his state-law cause of action. Thus, the Court

determines Hathaway's Motion is timely and that he did not waive his ability to bring it.

Turning to the substance of the matter, Hathaway tells a story of an injured worker who is mistreated, duped, and eventually fired, all because his employer wanted to avoid a worker's compensation claim. The Court starts its analysis at the beginning of his story.

### B. The Handwritten Report

Hathaway claims that the Handwritten Report, prepared by Gotch, contained information about his thumb, hand, and shoulder injuries. He testified that he reviewed it and signed it, and Gotch testified that he kept it in his file in his office, which was his usual practice. At some point, however, something happened to the Handwritten Report. Hathaway believes that IPC intentionally hid and possible destroyed it, whereas IPC suggests that Gotch must have discarded or lost it. To support this, IPC claims that Gotch is inconsistent in his testimony as to how he kept the reports and is therefore unreliable. In any event, IPC adds, it was under no legal duty to maintain the Handwritten Report.

At trial, IPC testified that it could not locate any handwritten accident reports for any of its employees. However, Hathaway subsequently produced other signed, handwritten accident reports for other employees. Additionally, Hathaway produced numerous other documents which he had signed, such as company policies and notices, taken from his file at IPC. This, he argues, shows that IPC was diligent in keeping documents he signed and introduces more doubt as to IPC's explanations.

Lastly, Hathaway references a July 2015 email Steele sent that describes the February 19, 2013, incident as follows: "Mr. Hathaway's original injury (Feb. of 2013) was reported as 'breaking down cardboard tote; [Ross Hathaway] slipped and tried to catch

himself, but his thumb caught (in the tote) and he fell, landing on his left side (this was later amended to include Mr. Hathaway's left arm was outstretched)." Dkt. 145-12 (parenthesis and brackets in original). Hathaway claims this description is consistent with the Handwritten Report and, because IPC has not produced any documents with language similar to this, Steele must have been quoting from the Handwritten Report. IPC suggests this email simply reflects Steele's recollection of how Hathaway added to his original version of events. Tellingly, IPC provides no explanation for Steele's use of quotation marks.

Under the facts as alleged by Hathaway, IPC's intentional withholding or destruction of the Handwritten Report supports an award of punitive damages. An employer's scheme to doctor or destroy a document to avoid a workers' compensation claim is a bad act made in a bad state of mind. *See Myers*, 95 P. 3d at 985. Additionally, Hathaway has provided evidence to support this. Gotch testified that he followed his normal practice when he put the Handwritten Report in his office. Hathaway provided other handwritten reports of other employees, simultaneously supporting Gotch's testimony and directly impeaching IPC's trial testimony that it did not have any handwritten reports for other employees. Similarly, IPC kept numerous other documents signed by Hathaway, but the Handwritten Report was missing. And though there is no direct evidence that the July 2015 email is quoting the Handwritten Report, the specific quotations and reference to Hathaway landing on his arm don't correspond with what IPC claims was in any of their reports. Thus, the facts and circumstances revolving around the Handwritten Report could support a claim for punitive damages.

### C. Steele's First Report

Next, Hathaway points to Steele's First Report as evidence of IPC's conspiracy. The First Report contained only Hathaway's thumb injury, despite Steele having received multiple medical documents that referenced a shoulder injury, including a letter from Dr. Curtis stating his strong belief that the shoulder injury was related to a workers' compensation claim. Indeed, at trial Steele testified that she had not received any medical documents relating to the February 19, 2013, incident before she prepared the First Report.

Hathaway then references an email where Liberty Mutual told Steele the "bad news" that the medical tests correlate with Hathaway's shoulder injury and Liberty Mutual would be covering the shoulder injury. Dkt. 145-10. He claims that Liberty Mutual used the "bad news" language to reflect Steele's negative attitude against him (Hathaway) and the reference to the shoulder injury undermines its omission in the First Report.

IPC argues the First Report's omission of the shoulder injury is reasonable because Steele did not know that Hathaway had visited Community Care on March 21, 2013, and in any event believed Hathaway's arm seizure was caused by his hyperglycemia. IPC further argues that, although Steele received the medical reports Community Care prepared and sent to her, there is no evidence that Steele ever reviewed them before she prepared the First Report. IPC then excuses Steele's trial testimony, blaming the lapse of four years between the events in this case and trial as the reason for her misstatement. Ultimately, IPC contends that the omission was justified because Steele sent a separate email to Liberty Mutual disclosing the medical documents from Community Care and told Liberty Mutual that she was unaware how to proceed due to her belief that Hathaway's March 21, 2013,

injuries were not related to the February 19, 2013, incident. As to the "bad news" statement, IPC states that "bad news" could reference any number of things—including Steel's concern for Hathaway's well-being—and is not evidence of an alleged conspiracy.

Just as with the Handwritten Report, the facts and circumstances surrounding the First Report include actions that could be described as outrageous, oppressive, malicious, or fraudulent. And again, Hathaway has provided evidence to support these allegations. IPC submitted the First Report without any reference to a shoulder injury, despite having received medical evidence of it. Steele even had a letter from Dr. Curtis—IPC's contracted workers' compensation doctor—containing Dr. Curtis's strong belief that the shoulder injury was workers' compensation related. Essentially, Steele substituted her own medical opinion for Dr. Curtis's and omitted the shoulder injury from the First Report.

Further, at trial, Steele testified that she did not have any medical information before she prepared the First Report. What is troubling to the Court is that when Steele gave this testimony, IPC had not disclosed it had received Community Care's medical reports prior to the submission of the First Report. If Hathaway hadn't made an objection, the Court would have believed the medical reports came after the First Report was submitted. Further, the Court is not as willing to attribute Steele's testimony to a lapse in memory, especially when such a mistake is easily remedied by a quick review of a few documents before trial. Thus, the facts and circumstances surrounding the First Report could support a claim for punitive damages.

### D. Hathaway's Termination

Finally, Hathaway alleges his termination and the circumstances surrounding it

demonstrate the extent to which IPC was willing to go in order to avoid his workers' compensation claim. First, he notes he was fired the day after he began to question IPC concerning the Handwritten Report, which shows that IPC wanted to silence him. IPC states that even if that were true, it would not affect his workers' compensation claim because the incident happened while he was employed. Thus, if Liberty Mutual accepted the claim, Hathaway would be covered regardless of his employment status after the incident. If his workers' compensation claim would be unaffected, IPC reasons, terminating his employment would not further any alleged conspiracy to avoid his shoulder injury claim. Additionally, IPC explains that it had a valid reason for terminating Hathaway without granting him an opportunity to respond: he stated he was going to hurt himself to get money, which a co-worker allegedly overheard and reported to IPC. Hathaway believes that this allegation alone should not have allowed IPC to terminate him without a chance to respond.

Admittedly, Hathaway's termination itself is not an act that is sufficient to justify an award of punitive damages. If Hathaway can convince a jury that he was wrongfully terminated it would aid his current claims against IPC, but alone would likely not rise to the level of punitive damages. Yet when this sudden termination is viewed in concert with the rest of Hathaway's story, it may also be evidence of IPC's punitive behavior. If IPC really did conspire to avoid Hathaway's shoulder injury claim, then IPC immediately terminating him the day after he questions the injury's omission from any reports shows that they were willing to take drastic steps to avoid his claim. Terminating Hathaway would prevent him from continuing to question IPC concerning its decision to omit his shoulder

injury, and thus decrease the likelihood of anybody uncovering IPC's alleged cover-up. This would be especially true if the given reason for termination was Hathaway's threats of fraudulently bringing a workers' compensation claim. Thus, the facts and circumstances surrounding Hathaway's termination could support a claim for punitive damages.

### E. Cumulative Effect

After weighing all the evidence presented by both sides, the Court determines that Hathaway has established a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages. Though each aspect of Hathaway's claim may not withstand analysis on its own, when viewed together, the cumulative effect prompts the Court to find that Hathaway has met his burden. If Hathaway's story is true, IPC conspired, doctored, destroyed, covered-up, and possibly even presented perjured testimony, all to avoid a workers' compensation claim for Hathaway's shoulder injury. Certainly, this could be described as bad acts done in a bad state of mind. *See Myers,* 95 P.3d at 985.

It is true that most of Hathaway's evidence is open to interpretation, but IPC combats this evidence only with its own interpretation. A jury may reasonably believe IPC's explanation for everything, but they may also believe Hathaway's. At this juncture, it is not necessary to determine which party's interpretation is the correct one. Instead, the Court must determine if there is a "reasonable likelihood" that Hathaway could prove facts at trial to support his claim for punitive damages. Idaho Code § 6–1604(2). Having determined IPC's conduct could be described as malicious, fraudulent, oppressive, or outrageous, and that Hathaway has established a reasonable likelihood that he could prove such conduct at trial, the Court GRANTS Hathaway's Motion.

In doing so, the Court advises that the threshold for amending a complaint to add a claim for punitive damages is significantly lower than the threshold for actually awarding punitive damages. The lower threshold is proportionate to the result; amending a pleading to include a claim for punitive damages is not the same as being awarded punitive damages, and neither are their respective standards. Amending the pleadings is just the first hurdle Hathaway must overcome; he must also present evidence at trial to establish a sufficient basis to support punitive damages.[2] Should he fail to do so, the Court will not allow the claim to go to the jury.

## V. CONCLUSION

In order to succeed on his Motion, the law requires Hathaway to convince the Court he had a "reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." Idaho Code § 6–1604(2). The Court finds that, when viewed comprehensively, a jury could find IPC's actions relating to Hathaway's workers' compensation claim to be oppressive, fraudulent, malicious, or outrageous conduct. Further, Hathaway has provided sufficient evidence to give him a reasonable likelihood of proving facts to support an award of punitive damages. Before Hathaway can submit his claim for punitive damages to the jury, though, he must make a motion to do so after his case in chief. Thus, Hathaway's Motion is GRANTED.

---

[2] Many of the documents referenced in this order are the subjects of multiple motions *in limine*. As the Court has not yet ruled on these motions, the Court assumes without deciding that the evidence presented in the briefing on this Motion is admissible. This order is no way affects the admissibility of the documents or the filed motions *in limine*.

# VI. ORDER

IT IS HEREBY ORDERED:

1. Hathaway's Motion to Amend to Seek Punitive Damages Pursuant to Idaho Code § 6–1604 (Dkt. 145) is GRANTED. The Court reserves the decision to submit Hathaway's claim for punitive damages to the jury until trial, after Plaintiff rests his case in chief and makes the appropriate motion.

2. IPC's Motion to Strike (Dkt. 172) is DISMISSED AS MOOT.

3. IPC's Motion to Expedite Decision on Defendant's Motion to Strike (Dkt. 173) is DISMISSED AS MOOT.

DATED: October 3, 2019

_____
David C. Nye
Chief U.S. District Court Judge