DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSS HATHAWAY, | Case No. 4:15-cv-00086-DCN |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TERMINATING SANCTIONS** |
| v. | |
| IDAHO PACIFIC CORPORATION, | |
| Defendant. | |

COMES NOW, Plaintiff Ross Hathaway ("Plaintiff" or "Hathaway") by and through counsel of record, Casperson Ulrich Dustin PLLC, and submits this Memorandum in Support of Plaintiff's Motion for Terminating Sanctions.

## I. INTRODUCTION

This case has been repeatedly hampered by discovery issues related to Idaho Pacific Corporation's ("IPC") failure to produce relevant and necessary information. Four days before trial, IPC disclosed a critical email with an attached electronic copy of the Incident Investigation Report ("Report") allegedly related to Hathaway's February 19, 2013, injury. IPC has previously represented the Report is its contemporaneous business record and was prepared by Gotch at or near the time of the accident on February 19, 2013. The e-mail, sent at 8:30 a.m. on March 29, 2013, states as follows:

Lori,

This is the accident report I filled out on Ross Hathoway on 2/19/13.  He said the only item that hurt was his thumb nothing about his shoulder or numbness in his arm.

Dwain

(Casperson Decl., ¶ 14, Ex. G ).  The metadata shows it was not "filled out" or prepared on February 19, 2013.  The Report was created on March 29, 2013, minutes before the email was sent, the same day that Lori Steele ("Steele") submitted the First Report of Injury, excluding Hathaway's shoulder. (Dkt. 21-6).  As a result of the very late disclosed document and information, the Court vacated the trial and reopened discovery.   (Dkt. 220). During the brief discovery period, Hathaway has discovered numerous additional emails IPC failed to produce, most of which are responsive to prior discovery requests. The amount of unproduced information would require Hathaway to start discovery all over again.  These late-disclosed emails reveal that Steele knew no Report existed for Hathaway on March 28, 2013, and she, Gotch, Erickson, and McLean plotted to exclude Hathaway's shoulder injury.  Another undisclosed email demonstrates that Hathaway's request to simply get a copy of the Report he signed served as the "nail in the coffin" for IPC's basis for termination. (Casperson Dec., ¶ 24, Exs. P & R). The failure to produce these documents, after they were specifically sought in discovery, is the final straw in a host of serious discovery abuses by IPC. Based on the cumulative impact of the abuses, IPC's false representations to the Court, and the inability to provide an adequate cure, Hathaway requests terminating sanctions.  In this case, it is warranted.

## II.  BACKGROUND FACTS

To understand the full picture of the discovery abuses[1] to which Hathaway has been subject in this case, Hathaway sets forth some of the history and more problematic issues below:

---

[1] The Court is already well aware of the Margaret Johnson issue, so Hathaway will not discuss it here.

**A.     Hathaway's Requests for the Recently Disclosed Information in Written Discovery**

Hathaway's case was filed on March 12, 2015.  (Dkt. 1).  Plaintiff specifically requested all documents, including electronic records, associated with Hathaway's employment, including his workplace injuries and worker's compensation.  (Casperson Decl., ¶ 3, Ex. A).  Though there were numerous requests in response to which IPC clearly failed to produce all documents and information, the most egregious was IPC's failure to fully respond to the following request:

> **REQUEST FOR PRODUCTION NO. 37.**: Please produce any and all documents, electronic records, emails, text messages, digital recordings, word processing files, etc., from the period of February 1, 2013, through present that in any way discuss, deal with, or relate to Plaintiff.
>
> **RESPONSE NO. 37**: Defendant IPC objects to this Request for Production on the grounds that it is vague, overbroad, and unduly burdensome. Without waiving said objections, Defendant IPC responds as follows:
>
> ***Defendant IPC has already produced all documents that in any way relate to Plaintiff's employment with IPC.***

(*Id.*)(italic emphasis added).  Based on IPC's answer, Hathaway believed IPC produced everything.  However, neither the email nor the Word version of the Report were produced until a few days before the last scheduled trial date.  IPC also recently produced additional emails referencing Hathaway that are too numerous to count. (Casperson  Decl., ¶ 24).

**B.     Request for the Email and Report by Deposition**

Hathaway took the depositions of the major players (at least as identified by IPC) involved in the February 19, 2013, accident and subsequent termination.  A multitude of testimony indicated that a handwritten report, signed by Hathaway, did, indeed, exist. (Casperson Decl., ¶ 10, Ex. D ("Mclean Depo."), p. 40-42, 43; ¶ 11, Ex. E ("Gotch Depo."), p. 33-34; ¶ 32, Ex. Z (Tr. at 310-311)).  On September 8, 2016, Hathaway took a Rule 30 (b)(6) deposition.  One of the identified topics was "[i]nformation and knowledge regarding the internal investigation of Plaintiff's workers' compensation claim that is the subject of the Complaint in this matter, including but not limited to,

video surveillance, witness statements, safety manager report, etc." (Casperson Decl., ¶ 9, Ex. C ("Steele Depo."), p. 7, Depo. Ex. 1). Steele, the 30(b)(6) designee, testified that the only thing she did to prepare was to read the topics. (Steele Depo., p. 9-10). Steele also testified IPC took no efforts to preserve any documents (Steele Depo., p. 63), that she was not aware of any instruction not to destroy any documents by way of a litigation hold (Steele Depo., p. 63), and that documents related to workers' compensation files are never destroyed, which would include injury reports. (Steele Depo., p. 62). Hathaway testified repeatedly that Gotch handwrote a Report that both he and Gotch signed. (Hathaway Depo., p. 97; 109-10; 139-40; 148-49; Tr. at 26-27; 88-90; 91-97).

At the deposition of Steele, the unsigned, typed Report was identified as Exhibit 6 and shown to Steele. (Steele Depo., p. 60). In addition, Steele was shown an email from Gotch (Exhibit 7) where he explained Hathaway asked for a copy of the handwritten, signed Report:

> He said that his shoulder was hurting him and he thought it might be from that incident. I told him I would not change the report because **it was the words that he told me the day of the slip and fall**. **I set them down in my office and write down exactly what they tell me and then I read it back to them before they sign the back page. He told me that it was okay and he signed the report at the time.** He asked me today for a copy of the report. I gave him the first page only, which is his words of what happened and what he could do to prevent it from happening again. None of the manager's notes or mine were on his copy.

(Steele Depo. Ex. 7). As the 30(b)(6) witness, Steele was specifically asked as the if she had an electronic version of the Report as follows:

> **Q.** **...Now, looking back at this particular Exhibit No. *-6, I don't see any handwritten notes on there. Do you?**
> A.   No, I do not.
> **Q.** **And there were no signatures, right?**
> A.   Correct.
> **Q.** **So can you tell me what happened to this document he's referring to in this e-mail?**
> A.   I don't know.
> **Q.** **Did you ever see it?**
> A.   No.
> **Q.** **So where would this document have been kept?**

A.      I could only guess perhaps in Mr. Dwain Gotch's files. I don't know.

**Q.      Dwain Gotch had separate files?**

A.      For injuries, I believe so.

**Q.      Have those files been produced to us, do you know?**

A.      As far as I'm aware, yes.

**Q.      Would you have an electronic copy of this particular document, Exhibit *-6?**

A.      If it was e-mailed to me, yes, I believe so.

**MS. ULRICH:** I guess I would like to have the original electronic copy if we could, Brad. If you could see if you could arrange that please?

**MR. WILLIAMS:** Yes.

(Steele Depo., p. 60).  Later during the multiple depositions taken during that timeframe, IPC's counsel informed Hathaway's counsel that an electronic copy of the Report could not be located. (Casperson Decl., ¶ 12).  Hathaway did not know that an email, which included a Word copy of the Report, existed, and Steele's emails showed she knew it was prepared in late March 2013.

## C.      Additional Documents Recently Disclosed

IPC's prior discovery representations that it had produced all documents related to Hathaway's employment with IPC were not true.  Locating documents related to Hathaway was not onerous or burdensome.  Hathaway did not have an email account and he was fired shortly before his year anniversary.  However, after the email with the attached Report was produced a few days before trial, Plaintiff's counsel questioned other potential holes, not knowing whether everything had been produced.  After a frustrating exchange with IPC's counsel, asserting that a simple search for "Hathaway" or "Hathoway"[2] should have been done long ago, IPC's counsel used IT to conduct a search, instead of relying on Steele.[3]  The result shows that Steele picked and chose what emails to produce in discovery.  Numerous unproduced emails were recently provided, all of which either

---

[2] Gotch misspelled Hathaway as "Hathoway," but Steele was aware of the misspelling.

[3] Presumably, counsel conducted the search to prove that everything had been produced not knowing Steele had not provided all the email correspondence.

included Steele or were forwarded to her.  (Casperson Decl., ¶ 24).  Although Steele attempted to claim it was IPC's IT person who was to gather emails, Steele is the only one who did so, and decided what to produce. (Casperson Depo., ¶ 31, Ex. Y; ¶ 27, Ex. X ("2nd Steele Depo."), p. 45-46, 58, 62-76, 110-11, 141-42, 203-09, 213-16; ¶ 25, Ex. V ("Jacobs Depo.", p. 35-36, 40-43, 46-53). Hathaway cannot address each of the recently produced documents, but will discuss the most egregious failed disclosures in the argument section below. Essentially, IPC failed to produce emails between Gotch and Steele regarding Hathaway's injury Reports; emails between Steele, McLean, Gotch, and Erickson regarding Hathaway's shoulder injury and a way to keep it from being work related; emails provided by Mike Willmore to Steele for production, including one on which the motivation for Hathaway's termination is discussed; and email correspondence between Steele and Mountain View regarding Hathaway. As explained below, the prior failure to produce all of these critical documents warrants terminating sanctions.

**D.     Failure to Produce the Document Quoted in Steele's July 22, 2015, Email**

Hathaway also requested during this limited discovery period that Steele produce the document quoted in her July 22, 2015, email: "Should you need this information, Mr. Hathaway's original injury (Feb. of 2013) was reported as 'breaking down a cardboard tote; [Ross Hathaway] slipped and tried to catch himself, but his thumb caught (in the tote) and he fell, landing on his left side (this was later amended to include Mr. Hathaway's left arm was outstretched)'".  (2nd Steele Depo., Ex. 32).  IPC claimed three documents contained that quote in response to Hathaway's discovery request, IPC000325-327. (2nd Steele Depo, p. 162, Ex. 35 & 36).  None of those documents contain the quote and Steele could not (or would not) explain where the quote originated. In fact, during her deposition, Steele tried to point to *another* document that included a few of the words here and there. (2nd Steele Depo., p. 162-167).  Based on the quotation, there is still a

document IPC has not produced, which could only be the signed handwritten Report.  IPC's other 30(b)(6) deponent, Todd Higgins, admitted as much when he was asked where he would expect that quote to have come from, responding: "The incident report." (Casperson Decl., ¶ 26, Ex. W ("Higgins Depo."), p. 33).

### III. <u>ARGUMENT</u>

**A.  Legal Standard for Terminating Sanctions**

Default against IPC is the only option in this case without having to start the litigation from scratch.   IPC's failure to disclose and produce the email and Report after nearly five years of litigation is egregious, but when combined with both the prior discovery abuses and the substantial additional information it did not produce, it would be unfair to force Hathaway to begin again.

The rules of discovery are intended to ensure both parties have "access to the true facts" because "[t]here is no point to a lawsuit, if it merely applies law to lies." *Conn. Gen. Life Ins. Co. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)(internal quotation marks and citation omitted).  Essentially, IPC has hidden for nearly five years that the Report it claimed was a contemporaneous business record was not prepared until March 29, 2013, roughly six weeks after Hathaway's fall on February 19, 2013.  That act is bad enough, but Steele failed to produce directly relevant emails showing Steele knew the Report did not exist on March 28, 2013, and that she consulted with McLean, Gotch, and Erickson to figure out how to exclude Hathaway's shoulder injury.  In addition, she failed to produce emails from April 17, 2013 showing that McLean and Steele were trying to "get [Hathaway] out of [there] as soon as possible."  (Casperson Decl., ¶ 24, Ex. R).  To allow IPC to hide this information and take positions contrary to it without consequences obliterates the foundation upon which our legal system is built.

Pursuant to Federal Rule of Civil Procedure 37, the Court should enter default. A dismissal pursuant to the court's inherent power and Rule 37 is a matter of the court's discretion.  *See*

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)(citing

*Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988)).  The district court's factual findings

may not be set aside unless they are clearly erroneous.  *Anheuser-Busch* at 348 (citing Fed. R. Civ.

P. 52 & *Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983)).  The

district court's credibility determinations are entitled to special deference.  *Anheuser-Busch* at 348

(citing *EEOC v. Bruno's Restaurant*, 13 F.3d 285, 289 (9th Cir. 1993)).  Before imposing the

"harsh" sanction of dismissal, the district court must weigh several factors: "(1) the public's interest

in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of

prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their

merits; and (5) the availability of less drastic sanctions."  *Anheuser-Busch* at 348 (citing *Henry*, 983

F.2d at 948).  For default to be proper, the conduct to be sanctioned must be due to "'willfulness,

fault, or bad faith.'"  *Id.* at 946 (quoting *Fjestad v. American Honda Motor Co.*, 762 F.2d 1334, 1337

(9th Cir. 1985)).  Due process concerns further require a relationship between the sanctioned party's

misconduct and the matters in controversy such that the transgression "threaten[s] to interfere with

the rightful decision of the case.'"  *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir.

1983); *see also Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir.

1982) (holding default entry violated due process where the sanctioned party's deception was wholly

unrelated to the merits of the controversy).  In evaluating the propriety of dismissal, the Ninth

Circuit considers "all incidents of [the party's] misconduct.  *See Adriana Int'l Corp. v. Thoeren*,

913 F.2d 1406, 1411 (9th Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100

(1991).      "It is well settled that dismissal is warranted where . . .  a party has engaged

deliberately in deceptive practices that undermine the integrity of judicial proceedings: 'courts have

inherent power to dismiss an action when a party has willfully deceived the court and engaged in

conduct utterly inconsistent with the orderly administration of justice.'"  *Wyle*, 709 F.2d at 589

(upholding dismissal of complaint pursuant to court's inherent power where plaintiff's denials of material fact were knowingly false and plaintiff willfully failed to comply with discovery orders); *see also Combs v. Rockwell Int'l Corp.*, 927 F.2d 486 (9th Cir. 1991) (affirming dismissal under the court's inherent power as appropriate sanction for falsifying a deposition), *cert. denied*, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); *Halaco Eng'g Co.*, 843 F.2d at 380 (reversing dismissal where alleged misconduct peripheral to merits of case, but observing, "[d]ismissal under the court's inherent powers is jusitified . . . in response to abusive litigation practices . . .and to insure the orderly administration of justice and the integrity fo the court's orders."); *North Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986)(affirming dismissal of defendant's counterclaim under court's inherent power for concealing documents and violating court's discovery order); *Phoceene Sous-Marine, S.A.,* 682 F.2d at 806 (noting "[i]t is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders [,]" but reversing entry of default because the deception was "peripheral" to the merits of the controversy).

Here, the discovery abuses are in no way "peripheral" to the merits of the case.  They are directly pertinent to the fundamental issue of IPC's liability for illegal and discriminatory conduct. The discovery issues in this case are much like what occurred in *Connecticut General Life Insurance Company v. New Images of Beverly Hills*, 482 F.3d 1091 (9th Cir. 2007). In that case, the Ninth Circuit upheld the district court's discretionary decision to issue terminating sanctions against the defendants due to the defendants' failure to properly respond to discovery, including failing to provide contact information for witnesses and asserting it misplaced or lost key documents.  *Id.* at 1095. The Ninth Circuit noted that when the defendants finally responded to the court's order compelling discovery, their responses appeared to be calculated to prevent plaintiffs from learning and proving the truth.  Like the defendants in *New Images*, here, because of the numerous discovery

issues, including a claimed inability to find a key signed document, failure to provide key witness contact information, the recent production of key emails and the electronic versions of key documents, and numerous relevant emails, IPC's "discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." *Id.* at 1097. Based on the recently produced documents, IPC also has made false representations to the Court and the jury, making IPC's conduct willful. Such circumstances warrant terminating sanctions.

**B.     Based on the Factors Set Forth Above, Terminating Sanctions are Warranted**

**1.     The Public's Interest in Expeditious Resolution**

The first factor the Court must consider is the public's interest in expeditious resolution of litigation.   *See Anheuser-Bush* at 348.   This case was filed in March of 2015 and Hathaway was fired in April 2013.   This case was tried once, which resulted in a hung jury on the ADA claims. In addition, the retrial has been vacated three times, only the last of which was caused by IPC. (Dkts. 141, 192 and 220).   Regardless, it is time for the case to conclude, and deciding how to deal with each and every unproduced document will be onerous. This factor weights in favor of default.

**2.     The Court's Need to Manage its Docket**

The second factor that must be considered is the court's need to manage its dockets. Because of the high volume of cases in the District of Idaho and limited number of judges, this factor weighs heavily in favor of terminating sanctions.   The Court has expended many hours on this case prior to the undisclosed report and numerous emails, which significantly alters IPC's prior arguments and representations.   IPC filed two motions for reconsideration on one issue related to a prior discovery abuse.   (Dkts. 49 and 132).   Neither Hathaway nor the Court have time to start over on a case that has been pending for such a long time without critical documents being disclosed. Hathaway would have to conduct discovery related to the vast amount of undisclosed information.   Further, the undisclosed documents will trigger numerous motions in limine, greatly expanding the time and

effort to conclude this case. IPC should not be allowed to waste the Court and Hathaway's time.

### 3.     The Risk of Prejudice to Hathaway

The third factor to be considered is the risk of prejudice to the party seeking sanctions. IPC's failure to produce the Report and relevant emails impacts the entire case.  As explained below, IPC's actions are so prejudicial to Hathaway as to be incurable.

### a.     IPC Made Numerous Arguments in Prior Pleadings Based Upon a False Assertion that the Report was Prepared on February 19, 2013

Throughout the litigation, IPC continually asserted and argued the typed, unsigned Report is a document created on or near February 19, 2013 and accurately described Hathaway's report of his fall and related injuries *at the time*:

- In its summary judgment argument, IPC argued the computerized Report simply replaced the handwritten Report, but there is no mention that it was not created until March 29, 2013.  (See Dkt. 18-1 at p. 4; Dkt. 18-2 at 19; Dkt. 23 at 10).

- Prior to the first trial, Hathaway moved to exclude Steele's Notes.  (Dkt. 50). Steele represented in the notes that "Dwain Gotch recorded the incident," with a date above it as Feb. 19, contrary to the March 29, 2013, creation date. (Dkt. 50-3 at 1).[4]

- As part of its objection to the Motion in Limine related to the Steele Notes, IPC argued that it is its "regular business practice to investigate injuries, and it was IPC's regular practice for Dwain Gotch to record the information reported to him when there was an injury," suggesting the Report was a contemporaneous business record created at the time of Hathaway's fall. (Dkt. 78 at 9).

- IPC argued that the Report was a contemporaneous record of the February 19, 2013, accident.  (Dkt. 195 at 6 & 9)

- IPC argued that there was no evidence that a handwritten, signed Incident Investigation Report ever existed.  (Dkt. 195 at 8).

- IPC argued that Gotch had no obligation to keep the handwritten, signed document after he generated a computer version, implying that the computer version was contemporaneously prepared and included the same information as the handwritten, signed document.  (Dkt. 167-1 at 2-4).

---

[4] As explained later, Steele knew the Word Report was created on or about March 29, 2013.

Throughout the entire record of this case, IPC falsely suggested, argued, and represented that the Report was prepared at or near the time of the accident.

        **b.**    **Steele Testified at Trial About Emails with Attached Reports that had Never Been Disclosed**

Perhaps the most concerning factor in evaluating prejudice is the testimony IPC elicited from Steele at trial, taking advantage of its failure to produce documents in discovery. In its attempt to establish that the Report and the puncture wound Report were business records, IPC elicited detailed testimony from Steele about how the documents are prepared and how she received them. Steele testified that she received Reports via email from Gotch. (Tr. at 412-14). IPC and its counsel had to know that no emails had been produced that showed the transfer of either Report for February 19, 2013, or April 2, 2013. Both IPC and its counsel had to know of the attached Word file, especially because Steele was asked about it at the 30(b)(6) deposition. At the time, and in the heat of trial, this testimony did not stick out as it does now.

As the Court is already aware, IPC produced its email correspondence during discovery in a manner that did not show the attachments. At trial, Hathaway caught Steele lying about when she received Hathaway's medical records. Hathaway objected to Steele's testimony about having no knowledge of the medical documentation from Mountain View on Hathaway's shoulder injury and its attempts to admit an email without the attached medical records. (Tr. at 423-27). Although the Court already considered Steele's misleading testimony in ruling on the punitive damages motion (Dkt. 204), Hathaway was unaware at the time of the undisclosed email with the attached Report. While the Court left the parties to figure out the attachments related to the email showing Steele had the medical documentation when she submitted the First Report of Injury, IPC's counsel stated she had Steele forward the emails to her so she had them electronically. IPC's counsel had on her cell phone the email that IPC attempted to put in the record, showing the attachments. (Casperson Decl.,

¶ 5). Knowing that IPC's counsel had at least some of the forwarded emails from Steele in her possession makes other testimony elicited from Steele very concerning. At trial, IPC elicited testimony from Steele about her receiving by email both the Report for the February 19, 2013 accident and the Report for Hathaway's April 2, 2013 puncture wound and argued that both Reports are business records, requiring a contemporaneous preparation:

Q.      Next I'll go to previously marked Joint Exhibit 3 [the Report] and then Defense Exhibit 2014 [the puncture would Incident Investigation Report]. That has not been admitted.  So I'll let you take a look at that one, and then we'll switch to the one that has not yet been admitted. So the jury won't use that one yet. And this is Defense Exhibit 2014.  Do you know what both of these documents are?

A.      Yes, I do.

Q.      What are they?

A.      They are the incident investigation reports that we utilize whenever there is an accident, near miss, or anything of that nature. It's a record of that event.

Q.      And does Idaho Pacific regularly prepare these documents within the scope of their business?

A.      Yes.

Q.      And how -- if you know, how are they -- how are they prepared?

A.      If an incident or something happens, from my understanding, the information is recorded. And then depending on what we need to do with that information, it could be forwarded to myself for a claim, or it could have other information, such as more investigation on what that hazard was or what happened.

Q.      And who would typically forward you these statements?

A.      Our safety director.

Q.      Normally when -- when do you receive or review these statements as part of your job?

A.      I normally receive them when there is a need to file a claim, whether that's a claim for medical or for workers' compensation income benefits. It could be when medical treatment is sought. If an employee didn't choose to seek treatment right away, then sometimes I'll receive these when the employee does request medical treatment.

Q.      Do you know when you received Defendant's Exhibit 2014?

A.      I believe I received this one the day after, on -- excuse me -- April 3rd possibly.

Q.      And why do you think that?

A.      I can't recall exactly, but it seems like I was notified that he had sought treatment. And at that time, I would have made sure that we had the record of incident on file so that a claim could begin.

Q.      And then to -- where do you keep the incident investigation reports?

A.      Incident investigation reports are kept in a workers' compensation file that I begin under the employee's name, and they are kept separate in my office.

> They are not accessible.
>
> Q.    Do you typically get handwritten or printed reports?
>
> A.    At the time, I can only recall receiving typed reports.
>
> Q.    How would they typically come to your attention? By email or an inbox?
>
> A.    They are normally emailed to me.
>
> Q.    And who would that have been emailed from?
>
> A.    Mr. Gotch.

(Tr. at 412-414).  Of course, IPC did not seek to introduce an email for either Report because neither had been produced and Hathaway had no way of knowing that a Word file of the Report was attached.  In fact, not only did IPC wait until the evening of October 23, 2019, to produce the document, IPC has just recently produced an email showing that Gotch sent Steele the Report for the puncture wound on April 4, 2013.  (Casperson Decl., ¶ 21, Ex. L).  Certainly, IPC and its counsel knew that the emails related to both of these Reports had never been produced at the time they prepared for the last trial.

### c.    IPC Argued at Trial that the Report was Prepared on February 19, 2013

IPC's representations at trial that the Report was prepared on or about February 19, 2013, spanned from opening to closing argument.  A list of the highlights where IPC argued and suggested the Report was prepared in February 2013 is as follows:

- "Now, the plaintiff alleges that he told Mr. Gotch he injured his shoulder and thumb. But the incident report that you will see shows only that he complained about his thumb being injured, not his shoulder."  (Tr. at 38);

- Hathaway is questioned about Gotch's practice of typing up the reports so he could put them on the bulletin board for other employees to see: "You know the one I'm talking about?  The one that didn't mention your shoulder that you complained about to Dwain." (Tr. at 155);

- IPC counsel suggests Hathaway is making "alarming" and "highly inappropriate" assertions that the shoulder was left out of the Report, when the Report, unbeknownst to Hathaway and his counsel, was not prepared until six weeks after the accident. (Tr. 196-97);

- IPC counsel argued that the Reports, even unsigned, meet the requirements of a business record, including a contemporaneous preparation.  (Tr. at 302-03);

- IPC counsel elicited testimony from Gotch that he would send over a previously prepared Report to HR when a worker's compensation claim needs to be filed.  (Tr. at 304);

- Wally Browning testified that Gotch conducted accident investigations, but only kept the computer versions, implying that the Reports were done at the time of the accident.  (Tr. at 503);

- During closing argument, IPC's counsel argued as follows: "And through this case, **we have produced boxes, everything that could be found except the handwritten note. And I'll talk about that. Every email, every document, everything.** And there is not one single document that suggests or even implies Idaho Pacific discriminated against Mr. Hathaway or terminated him because of some alleged disability."  (Tr. at 636);

- IPC also asserted the following in closing:  "And then, just about an hour after that, Mr. Hathaway sat down with Mr. Gotch and told him his story. He said he told him all about his shoulder pain and that Mr. Gotch wrote it down. But Mr. Gotch's incident report doesn't say anything about a shoulder. It says the exact same thing that's put in this exhibit by Carrie Dimos."  (Tr. at 644);

- "He said he told Carrie Dimos, 'My shoulder was hurt,' but it's not in her report. He said he told Dwain he hurt his shoulder, but it's not in his report."  (Tr. at 648);

- Wally Browning admitted that IPC failed to preserve records like it should have. (Tr. at 509-510).

IPC clearly abused the process by failing to produce documents showing that the Report was not prepared contemporaneously, and then argue to the jury and the Court that it was.

### d.  The Recently Produced Documents Completely Reframe the Case and Undermine IPC's Defense.

#### (1) The March 29, 2013 Email and Report from Gotch

The metadata shows that Gotch created and saved the Report at 8:27 a.m. on March 29, 2013. (Casperson Decl., ¶ 24, Ex. P).  This document and metadata provides direct evidence of Hathaway's testimony that Gotch told him he was instructed to omit the shoulder injury from the Report and that Hathaway would have to talk to the office to get it changed.  As a result, the Court cannot cure any prejudice by merely prohibiting IPC from using or relying on the document or arguing that the Report is a business record.  Hathaway should have had this email and Report long

ago to be able to use in discovery and at trial.[5]

### (2)   Emails from or to Steele Regarding Hathaway

Steele also failed to produce an incredibly important email, that again, had to be a deliberate choice.  "Hathaway" is in the subject of and typed in the body of the email.  On March 28, 2013, Steele received an email at approximately 4:20 p.m. from Mountain View with attached documents, including both Hathaway's medical visit information and Dr. Curtis's letter where he explained Hathaway's shoulder injury is related to his fall at work.  Steele forwarded the email the same day just a few minutes later, with attachments, to Mclean, Erickson, and Gotch, stating:

> Dwain, Steve, and Kelsey – we need to get together and discuss this ASAP as Mr. Hathaway is attempting to relate his most recent events with his previous fall at work.
>
> Dwain, I found where his fall was listed on the incidents spread sheet for Feb. 19th, but could not find a copy of the report, could you send that to me right away?
>
> Thank you,
>
> Lori Steele

(Depo. Ex. 21).  Steele admitted that Gotch's reports were available to her on the computer system and that she looked and knew that no electronic Report existed on March 28, 2013.  (2nd Steele Depo., p. 168).  The next day, March 29th, Gotch emailed Steele the attached Report in Word at 8:30 a.m. — a Report Steele knew did not exist as of the prior afternoon.  The above email clearly shows that these four employees conspired to figure out how to exclude Hathaway's shoulder injury.  Again, not having this email for all of discovery and an entire trial of this case is outrageous and creates an incurable prejudice. Default is required.

### (3)   Mike Willmore's Forwarded Emails

---

[5] IPC also failed to produce the Word Report for the puncture wound, which was prepared at or near the time of the accident. (Casperson Decl., ¶ 21, Ex. L).

On or about February 24, 2016, Willmore forwarded to Steele emails related to Hathaway. Each email Willmore sent Steele has "Hathaway" or "Hathoway" in the subject line.[6]  (Casperson Decl., ¶ 24, Ex. T).  Steele provided some, but not all of these emails, to IPC's counsel. In what must have been a calculated decision, among the emails Steele withheld was an email from McLean, which is part of a chain on April 17, 2013, in which Gotch claimed that Hathaway wanted him to change the Report that Hathaway signed.  In the email, McLean states:

> I think this should be the final nail in the coffin.  To go and ask that the safety manager modify the accident report to tailor his modified story is not right. I talked to Lori but she said she still needed to do more research?  I really don't want this guy on the property because with our luck he'll end up with a real work comp claim that we'll be dealing with for a long time to come.
>
> I guess we'll see what Lori comes up with tomorrow and try to get him out of here as soon as possible.  Kelsey is going to have Carrie bird dog him while he is here just to keep an eye on him and help prevent any "possible accidents" from occurring before we get to talk to him.  Todd, would you want to be a part of that interview with Ross once Lori completes her homework or just have Mike, Kelsey and I handle it again?
>
> Thanks
> Steve

(Depo. Ex. 19 at 29). Steele confirmed she was researching Hathaway's worker's compensation claim. (2nd Steele Depo., p. 102-03).  Just like the knowledge that the Report was not prepared until March 29, 2013, this email is a gamechanger too.  McLean, identified by IPC as the person who made the final termination decision, admits that it was Hathaway's action in trying to get a copy of the signed Report that was the final "nail in the coffin," not any alleged statement from Margaret Johnson.[7] This email directly contradicts IPC's entire defense that Hathaway's termination had

___

[6] Every document not produced by IPC has Hathaway or Hathoway in the subject line or body of the email.

[7] IPC argued in summary judgment that "it was [Johnson's] statement, and nothing else, that led to Hathaway's termination." (Dkt. 23 at 11).

nothing to do with Hathaway's shoulder injury or attempt to obtain the Report he signed for purposes of the injury.  Of course, Hathaway never got a chance to ask any of IPC's employees about this email.

Steele's testified she thought she sent the Willmore emails to legal counsel, but there is no evidence to support it. (Casperson Decl., ¶ 24.f).  Regardless of who is responsible for not producing the emails, the prejudice to Hathaway remains unchanged.  This email is the "nail in the coffin," in support of default.

### (4)    Emails with Mountain View

Steele failed to produce emails and documents she received from Mountain View for Hathaway's March 28th and April 8th, 2013, visits.  Hathaway also had a followup visit on April 15, 2013, but IPC has still not produced any email or documents related to that visit. (Casperson Decl., ¶ 15, Ex. H). After discovery was reopened, Hathaway subpoenaed his worker's compensation file from Mountain View related to IPC.  The April 15, 2013, visit information is included, as well as another letter from Dr. Curtis.  (Depo. Ex. 26).  Steele claims she never received correspondence from Mountain View related to the April 15th visit or Dr. Curtis's second letter. (2nd Steele Depo., p. 138-40).  Whether Steele did receive it and deleted it is unknown.

In addition, Steele failed to produce her correspondence with Mountain View on or about March 7, 2016, in order to obtain the test results from Hathaway's March 21, 2013, visit. (2nd Steele Depo, Ex. 27).  Both Hathaway's blood sugar and A1C results were within a normal range for the day that IPC insisted Hathaway's problems were either hypo or hyperglycemia. Steele certainly appears to have made a deliberate choice not to produce this email and the attachment, which would confirm Dr. Curtis's medical opinion that Hathaway's problems were not hypo or hyperglycemia related, and that IPC's attempt to shift blame for Hathaway's injuries to blood sugar issues was unsupported.  Finally, Steele failed to produce an email with Mountain View on or about March 28,

2013, in which she inquired as to the time Hathaway checked in for his visit.  (2nd Steele Depo. Ex. 30).  It certainly appears that Steele was looking for another reason to support firing Hathaway.

### e.    Prejudice to Hathaway from IPC's Cumulative Actions Requires Default

There are multiple instances of discovery abuses in this case, which culminated in the recent discovery that IPC withheld substantial critical information.  The cumulative effect of IPC's multiple discovery abuses in this matter constitutes extreme prejudice to Hathaway, and constitutes a miscarriage of justice and abuse of the litigation process which has so pervaded this case as to be incurable.  Further, the evidence demonstrates that IPC's actions were due to "willfulness, fault or bad faith" on the part of IPC. Steele managed the production of documents from IPC to legal counsel and chose not to provide significant information.  Its complete failure to produce relevant and requested discovery violates Rule 37.  There is no cure but default.

### 4.    Public Policy Favoring Disposition of Cases on Their Merits

The fourth factor is the public policy favoring disposition of cases on their merits. Here, IPC has had ample opportunity to seek disposition of this case on the merits, but at every turn, it has failed to provide Hathaway with all of the documentation requested and made representations to the Court and jury which contradict the documents IPC kept from Hathaway. While this factor would generally weigh against default, at this point, disposing of the case on its merits would be a farce. IPC's conduct has so muddied the water as to the actual facts that it is nearly impossible to get to the true merits. *See, i.e., Conn. Gen. Life Ins. Co. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)(internal quotation marks and citation omitted)("[t]here is no point to a lawsuit, if it merely applies law to lies.").  Consequently, this factor weighs in favor of dismissal.

### 5.    Availability of Less Drastic Sanctions

The final factor to be considered by the Court is the availability of less drastic sanctions. Considering the repeated pattern of IPC's conduct, a less drastic sanction would not cure the

prejudice to Hathaway.  The amount of unproduced information has rendered much of the prior discovery useless.  Attempting to try this case with IPC's various shifting stories would be incredibly difficult.  The missing or unproduced handwritten, signed Report, the failure to provide information for Johnson, the failure to prepare the 30(b)(6) witness, improper redactions, the attempt to elicit false testimony from Steele at trial, the unexplained quotations that appear to be from the handwritten, signed Report, the undisclosed email and attached electronic Report, and the numerous emails directly on point and detrimental to IPC, lead to the inescapable conclusion that IPC has not conducted discovery in a reliable or truthful manner. It would be impossible to repair so many issues.  The Court would be required to rule on each of the undisclosed documents or emails to fashion a remedy for their use or exclusion.  The merits would be lost in the vast evidentiary limitations.  It would be unfair to require Hathaway, or the Court, to address the consequences of IPC's failure to conduct discovery in a fair manner.  Hathaway requests entry of default against IPC.

### IV. <u>CONCLUSION</u>

Based upon the foregoing, Hathaway respectfully requests that the Court grant his Motion for Terminating Sanctions.

Dated this 10th day of January, 2020.          _____/s/_____

DeAnne Casperson, Esq.
CASPERSON ULRICH DUSTIN PLLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of January, 2020, I filed the foregoing electronically through the CM/ECF system, which causes the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

**DOCUMENTS SERVED:    MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TERMINATING SANCTIONS**

**ATTORNEYS SERVED:**

Bradley J. Williams
Amy A. Lombardo
PARSONS BEHLE & LATIMER
350 Memorial Drive, Suite 300
Idaho Falls, Idaho 83402
Email: bwilliams@parsonsbehle.com
          alombardo@parsonsbehle.com

_____/s/_____
DeAnne Casperson
CASPERSON ULRICH DUSTIN PLLC

C:\Users\Amanda\Casperson Ulrich Dustin PLLC\Casperson Ulrich Dustin PLLC Team Site - Documents\Active Cases\17423 Hathaway\Pleadings\Sanctions.Default.MEMO.wpd.REV3.wpd