Amy A. Lombardo, ISB No. 8646
Brook B. Bond, ISB No. 6340
Boise Office Managing Shareholder
PARSONS BEHLE & LATIMER
350 Memorial Drive, Suite 300
Post Office Box 51505
Idaho Falls, Idaho  83405
Telephone  (208) 522-6700
Facsimile  (208) 522-5111
ALombardo@parsonsbehle.com
BBond@parsonsbehle.com

Attorneys for Idaho-Pacific Corporation

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSS HATHAWAY,<br><br>                    Plaintiff,<br><br>vs.<br><br>IDAHO PACIFIC CORPORATION,<br><br>                    Defendant. | Case No. 4:15-CV-00086-DCN<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TERMINATING SANCTIONS** |

Plaintiff Ross Hathaway ("Hathaway") asks this Court to impose terminating sanctions against Idaho Pacific Corporation ("Idaho Pacific" or "IPC") for (1) allegedly failing to produce documents and metadata, and (2) for allegedly deceptive representations based upon the same failed disclosures. Hathaway's motion should be denied.

There is absolutely no evidence or suggestion that Idaho Pacific's inadvertent error to not initially produce a handful of emails was done in bad faith, and no discovery order has been violated.  The law requires at least "bad faith" before terminating sanctions are warranted.  Even if every inference and suggestion by Hathaway is accurate – which they are not – this Court should

1

find that the requisite willfulness and bad faith required to impose the ultimate sanction against the company are not present here.

Idaho Pacific admits its mistake in failing to locate and produce all documents during the discovery process – but still acted in good faith. Idaho Pacific produced the documents when they were located and would have actually benefited significantly from those documents had they been located earlier and used at trial. Idaho Pacific made concerted efforts during the discovery period to identify and turn over all documents, electronic or otherwise, related to Hathaway's claims. Idaho Pacific has also quickly and consistently supplemented its document production whenever a question or a deficiency was raised, even as the first of such questions came only after the close of discovery and after a first trial was completed in 2017.

To the extent some documents were not produced during the discovery period, they have now been produced. Idaho Pacific has willingly and cooperatively investigated the circumstances and has even completely re-devised searches, going beyond the parameters of Hathaway's requests in some instances.

Second, Hathaway's argument that Idaho Pacific made deceptive representations of the facts is based upon speculation and conjecture regarding the motives of Idaho Pacific and its witnesses. Such mischaracterizations are unsupported by the evidence. Neither party was aware of information within a document's metadata prior to the first trial, so Idaho Pacific could not have made deceptive representations based upon metadata that was not examined, nor routinely provided by either party during discovery.

Idaho Pacific has investigated and corrected its disclosures where appropriate, and has supplemented within the parameters of the Rules. Thus, because Idaho Pacific has not intentionally withheld information or documents, an appropriate sanction is something far short of

terminating the company's ability to have a jury decide the case.  Justice is served here by permitting a jury to decide whether Hathaway truly reported a shoulder injury to Idaho Pacific in February 2013 or not, and whether his story is believable that Idaho Pacific terminated him for being injured or for reporting a workers' compensation claim.

To justify terminating sanctions, the law requires intentional bad faith as well as extraordinary circumstances. *In re Rubin*, 769 F.2d 611, 618 (9th Cir. 1985).  Accordingly, because there is no evidence of intentional bad faith (there is actual evidence of good faith upon discovery of the mistake), and no evidence of extraordinary circumstances, terminating sanctions are not justified.

## I.     THE FACTUAL CONTEXT WITHIN WHICH HATHAWAY'S ALLEGATIONS MUST BE CONSIDERED

### A.     Overview

This is essentially a wrongful termination case for a single employee plaintiff.  Hathaway filed his lawsuit alleging wrongful termination along with two additional claims of ADA discrimination and retaliation in 2015.  The case is a straightforward, uncomplicated litigation matter with a number of factual issues to be decided by a jury.  The parties and their attorneys behaved throughout the initial discovery period in a straightforward, albeit simplistic manner: documents were provided to counsel from printed emails, both parties produced documents in PDF format, and once the documents were produced in such a format, there was no objection until over two years had passed, discovery had long since closed, and a trial was over.  In fact, in discussions between counsel, no one appeared to have used the word "metadata" in the case until the spring of 2019, and no one specifically used the term "native format" to refer to any produced documents until the parties were preparing for the second trial.

During the initial discovery period ("Discovery Period") which ended on September 30, 2016, the parties in this case exchanged initial disclosures, and each propounded a single set of interrogatories and requests for production of documents upon the other.  The parties appeared to send written discovery requests and responses via facsimile. *See*, Dkt. 16; Declaration of Amy A. Lombardo ("Lombardo Decl.") ¶ 7, **Exhibit 1**.  And, during the Discovery Period, both parties produced documents in portable document format ("PDF"). Lombardo Decl. ¶¶ 8, 10, **Exhibit 1**. Over this period, Idaho Pacific produced at least 3,341 pages[1] of documents.  During the same period, Hathaway produced about 308 pages.  Lombardo Decl. ¶ 11, Exhibit 2.

After the first trial was held in this case, Hathaway began to request supplementation of discovery.  *See* Lombardo Decl. ¶ **Exhibit 3**. During the post-trial period, Idaho Pacific has produced well over 784 bates-stamped pages, most of which are only now relevant and responsive – *i.e.*, those documents which are related to the initial discovery process *itself*, rather than relating to the claims or defenses of the lawsuit.  *See id.* **Exhibit 4** (Table).

Approximately 750 of the 784[2] were produced from December 2, 2019 to January 6, 2020, within the court-ordered, limited, re-opened discovery period.  Of the 784, many of those documents had already been produced during the Discovery Period, but were re-produced post-trial in a revised format per Hathaway's requests.  See Lombardo *id*. **Exhibits 4** and **5**. Also, during the post-trial period, Hathaway has supplemented his production with 179 pages of documents,

---

[1] A precise number of documents produced is intentionally not used herein, as it appears that the parties may have produced documents to one another via e-mail communication, without bates numbers on at least one occasion.  Lombardo Decl. ¶ 11, **Exhibit 2**.

[2] Here, this reference is to a bates number range only, which does not precisely reflect the number of pages or documents due to some of the discovery being produced in PDF images and some produced as native Outlook (email) and Microsoft Word files.

many of which are new to Idaho Pacific.  *See* Declaration of DeAnne Casperson at ¶ 15 (Dkt. 227-2).

Of the 750, a good number of these were provided in an effort to be as transparent, open, and cooperative as possible, given Hathaway's concerns with Idaho Pacific's document production during the Discovery Period.

During the Discovery Period, Idaho Pacific only mistakenly failed to locate about 45 documents.[3]  Of these approximately 45 documents,

- 19 are strings of the same or related email communication;

- 8 are related to a string of email of which the substantive content was previously produced;

- 1 is a duplicate

- 7 or so are documents where the attachment has been produced but the email forwarding the attachments was missed.

The vast majority are not substantive communications.  Of the few that are substantive, or arguably substantive, virtually zero are prejudicial to Hathaway.  In fact, these documents only support the testimony already provided by Idaho Pacific, and would have been beneficial for Idaho Pacific to have used at trial.  To the extent Hathaway argues that the documents in fact support his prior testimony, he should now be permitted to argue such facts to the jury.  If Hathaway's argument is that certain theories he presented to the jury were on thin evidentiary ground before, and the same cannot be asserted now, this does not weigh in favor of terminating sanctions.  Rather, evidentiary

---

[3] Should the court wish to examine these documents under seal, Idaho Pacific will provide the court with access.

sanctions limiting objections or arguments would be far more appropriate.  Plus, terminating sanctions would not comply with the applicable law under these circumstances.

### B.   <u>Document Collection and Preservation by Idaho Pacific</u>

Idaho Pacific dutifully searched for, and the company continually preserves, relevant documents and emails.

### 1.   Idaho Pacific's Systems, Retention Practices, and Retrieval Practices

Idaho Pacific's Corporate IT Manager, Mr. Terry Jacobs, has been employed by Idaho Pacific since 2006, first as an Information Technology (IT) contractor, then as an employee. Lombardo Decl. **Exhibit 6** ("Jacobs Depo.") at 16:24-17:24.  He is currently the corporate IT manager. *Id*. at 7:18-22.  Jacobs testified that Idaho Pacific does not routinely destroy emails.  In fact, email servers are backed up daily and the back-up tapes are stored in a safe deposit box at the Bank of Commerce.  Jacobs Depo at 27:22-31:4. Jacobs testified that he searched the back-up tapes as part of this litigation, and that he helped Steele recover information in a number of different ways. *See, id.* at 31:6-32:12, 35:2-4, 9-15, 18-24.

Jacobs testified that when an employee asks him to recover e-mails, or find documents for them, he would typically use every method available to recover the information, but that if a search is not initially fruitful, that persistence is required, and creativity.  That at times the results a user expects to find do not come up as a result of a search, and investigation, further digging, more searches with changing variables, are required to find out why.  Jacobs Depo at 141:1-17.

Jacobs estimated that he assisted Steele in searching her emails for the Hathaway litigation on at least three occasions, and probably more.  Jacobs Depo at 139:12-19.

## 2.      Initial Document Collection Process

After the Complaint was filed, Human Resources Director Lorinda Steele ("Steele") asked Jacobs to assist in gathering electronic documents related to Hathaway for the relevant time period – from the day before his fall until the last day of the month he was employed.  *See*, Lombardo Decl., **Exhibit 7**, Deposition Transcript of Lorinda Steele ("Steele Depo."), Jacob's Depo (IPC000424). Jacobs testified that he would have followed-up with Steele on her request, either by email or, more likely, in person, because her office is near his.  Jacobs Depo. at 142:16-25-143:2, and 144:1-10.

As a result of the specific search requested in Steele's email, Jacobs testified that the specific email request was for scanned documents, and he did not find any scanned documents on Dwain Gotch's former staging drive (the staging drive is not somewhere documents would have been retained, it is for staging only). Jacobs Depo. at 144:11-24.

In recounting a specific search for documents in 2015, Jacobs stated he would not be able to describe exactly what he did in a search, because each individual search involves many tasks to get to the desired result. *Id.* at 141:18-25.  He also testified that regarding a particular document search he was asked to do in 2015 for this case, there was not one single file that exists which contains everything retrieved in the search. *Id*. at 143:3-6.

Jacobs testified about a period of time where Steele had discovered a gap in her emails – where she believed she was missing some, but not all, of her sent emails from the period of time from November of 2012 when she began working at Idaho Pacific, to approximately August of 2013. *See* Jacobs Depo. at 162:9-25 to 164:8.

In 2015, Lori Steele also asked Todd Higgins, the safety director who replaced Dwain Gotch, for assistance in searching his computer. *See*, Lombardo Decl. **Exhibit 8** ("Higgins

Depo.")(IPC000425-427). At that time, both spellings of "Hathaway" and "Hathoway" were searched by Todd Higgins. *Id*. As the replacement for Dwain Gotch, Todd Higgins had access to the hard drive and documents that were formerly used and created by Dwain Gotch.  Steele also checked with Mike Wilmore for any paper copies of anything he may have had regarding Ross Hathaway, and particularly copies of his signed February 2013 incident report. *See,* Steele Depo. IPC425.

Todd Higgins also made extensive searches for the alleged signed, handwritten report which Hathaway claims is key to his case. *See,* Higgins Depo. This process, conducted in earnest, was a reasonable approach to try to locate, preserve, and produce relevant documents – and it appears that Steele was particularly and diligently searching for the alleged missing "handwritten, signed" incident report.  This process has also been transparent – these emails regarding the search itself were produced in 2015.[4]

### C.   Initial Discovery Period

The emphasis by litigators and courts on accounting for electronically stored information ("ESI") has increased, and Rule 16.1 has been amended, since the time the parties began this litigation in March of 2015.  Prior to January 1, 2016, when the local rules were updated to include preliminary discussions of ESI, parties engaged in litigation in this district were not required to discuss the parameters of their anticipated ESI discovery until the initial scheduling conference.

---

[4] Documents with the bates label of "IPC" designate documents produced by IPC during the Discovery Period.  Documents with the bates label of "IPC_Supp" designate documents supplemented by IPC post-trial when requested by Plaintiff or when IPC became aware of a deficiency in production, during the "Second Discovery Period."

*See* Dist. Idaho Loc. Civ. R. 16.1 (2015).[5] The limited attention to ESI was in stark contrast to the time devoted to all of the other significant discovery issues, which the parties were explicitly required to confer and discuss "at least twenty-one (21) days before the time and date set for the scheduling conference." *Id.* Today, the District of Idaho's rules and form order require that parties discuss ESI (including preservation and proportionality, ESI, ESI File Format, ESI Production Format, ESI Search Methodology, and General ESI Production vs. Email Production, Post-Complaint Communications, etc.) at the outset of the case, imposing the same twenty-one day rule that applies to all other significant discovery issues.  *See* Dist. Idaho Loc. Civ. R. 16.1(a) (2020); Court's litigation plan and discovery plan referenced at https://www.id.uscourts.gov/district/judges/nye/Scheduling_Conferences.cfm (last accessed January 29, 2020).

Accordingly, the issues Hathaway primarily complains of now—nearly five years into the litigation—were of less significance when discovery plans were made in this case. In fact, the Case Management Order and Litigation Plan are silent on ESI issues. These documents were filed in June, 2015 (Dkt. 8-9), only a few days after the attorneys who represented Idaho Pacific throughout the Discovery Period entered their appearances in the case.[6]  The discovery period was set to be completed by June 22, 2016. *See*, Dkt. 9 p. 3.  The Litigation Plan, drafted on a form last revised in 2003, reveals no record of any discussion between the parties regarding the methods of discovery or how the parties would treat ESI. The parties came to <u>no</u> agreement regarding many

---

[5] A redline of the changes to Local Rule 16.1 that took effect January 1, 2016 is located on the court's website and is attached as **Exhibit 9**, Lombardo Decl.

[6] Idaho Pacific was first represented by Thomson Holman, who filed the Answer in this case on May 15, 2015 (Dkt.4).

things that they would be required to discuss thoroughly from the outset of the case had it been filed today. Nevertheless, much of Hathaway's argument in his terminating sanctions motion is based upon the idea that because none of the parties used evidence regarding when the typewritten incident report was created – because Idaho Pacific did not disclose that information – Idaho Pacific acted in bad faith and a terminating sanction is now warranted. That argument presents a one-sided and misleading picture of the discovery conducted in this case. *See,* Lombardo Decl. **Exhibit 10** for relevant portions of the trial transcript.

Both Hathaway and Idaho Pacific exchanged initial disclosures and documents on or about July 24, 2015.  Idaho Pacific's initial disclosures were accompanied by 233 bates labeled pages of PDF documents, including Hathaway's employment files, e-mails regarding Hathaway's March 21, 2013 incident, e-mails regarding Hathaway's April 4, 2013 incident, documents from Mountain View Community Care regarding Hathaway's medical visits, witness statements, employment separation and termination documents, Idaho Department of Labor and Idaho Industrial Commission documents regarding unemployment and worker's compensation matters, and correspondence and documents regarding worker's compensation  information, EEOC filings, and the like.

On Friday, October 23, 2015, Hathaway propounded Plaintiff's First Set of Discovery Requests to Idaho Pacific via facsimile.  *See* Lombardo Decl. **Exhibit** 1.

In response to discovery requests, Lori Steele gathered and emailed to Idaho Pacific's counsel certain requested material such as the handbook, time sheets, job description, code of conduct, and other items.  She separately received and sent a summary of benefits from the worker's compensation carrier. *See id.*  **Exhibit 11** (IPCSupp_000658).  Regarding RFP No. 37, Steele informed her counsel at the time that the email communication regarding Mr. Hathaway's

workers' compensation claim was too large to email and would need to be delivered. *Id*. at **Exhibit 12** (IPCSupp_000735)

On December 1, 2015, Moffatt Thomas received a couple "stack[s]" of documents from the client and they were uploaded in order to produce for discovery. *Id.* **Exhibit 13**. Ultimately, IPC responded and provided approximately 213 pages of responsive documents on or about December 7, 2015, many of which were emails.

In February and March of the next year, the parties discussed their disputes regarding the nature and scope of discovery. *See*, Lombardo Decl. **Exhibit 14** (selected letters between counsel). Hathaway sent a detailed and presumably comprehensive letter regarding all of the discovery sought and any alleged deficiencies within IPC's production of documents. *Id*. The record does not show that Hathaway ever asked for clarification as to whether or not any further documents existed that would not be included within Hathaway's employment file, and Hathaway never asked the Court to overrule IPC's objections to Rule 37. The objection was no doubt lodged because the request was overbroad – as an employee, Hathaway's name would have come up in numerous company reports regarding employees – repetitive hourly and daily reports, benefit reports, daily, weekly, other various attendance reports, payroll reports, etc. The idea that Idaho Pacific could have or should have provided "everything" or that a simple search of the word Hathaway would have been a simple, easy and inclusive process is misguided.

Hathaway approached Judge Winmill's law clerk regarding the items where the parties could not come to an agreement. At the time, Hathaway's theory of the case was that IPC terminated employees who were injured at work, and Hathaway had requested employee files for all employees who had been terminated, all employees who had filed a worker's compensation claim, etc. Ultimately IPC was asked to search employee files for a number of terms chosen by

Hathaway.  *See* Lombardo Decl. **Exhibit 15**. Idaho Pacific performed a diligent and extensive search for this information (many of the specific emails about this extensive search have now been provided to Hathaway as part of the "discovery regarding discovery" process).  And Idaho Pacific hand-delivered more than a box of documents to counsel for this production.  Idaho Pacific produced about 2,895 pages of documents from various employee files on July 26, 2016.

On August 23, 2016, the Court approved the parties' stipulation to amend the Case Management Order, and the new discovery cutoff date was moved to September 30, 2016. Dkt. 16.

Hathaway then took five depositions just prior to the September 30, 2016 discovery cut-off – Lori Steele, Kelsey Erickson (September 8, 2016), Steve McLean (September 9, 2016), Dwain Gotch (September 20, 2016) and Carrie Dimos (September 21, 2016).  Casperson Decl. at ¶ 8.  Hathaway's deposition was also taken on September 20.  The witnesses were not asked what documents were attached to what emails.  Idaho Pacific was never informed at this time that Hathaway believed any of its discovery responses to be deficient.  *See* Steel Depo.

No motion to compel was filed during the Discovery Period.  No objections were raised as to the format of the documents provided during the Discovery Period.  No follow up occurred, to Idaho Pacific's knowledge or counsel Bradley Williams' knowledge, to request documents in a different format – *i.e.*, documents in native format so that the parties could access the metadata, or documents in a native format where email attachments may be opened directly from the native email.  *See,* Declaration of Bradley J. Williams. Such a request would have completely altered the way the parties conducted discovery in this case.  By way of illustration, a document in its native form is unable to be bates-labeled with a number on the document itself, so had Hathaway

requested documents in this manner, documents exchanged would not have been directly numbered on the document with "IPC" or "PL".

### D.   **Factual Allegations**

Hathaway's initial Complaint was filed on March 12, 2015. Dkt. 1.  It alleged that (1) Hathaway was terminated for one of his disabilities (left shoulder, hand, arm, and hypoglycemia); (2) that he was retaliated against for reporting an injury to his hand and arm; and (3) that he was terminated for reporting his injuries, seeking medical care, and for raising concerns about inaccuracies in the incident report of workplace injury. Dkt. 1, ¶¶ 62, 72, 86.

Over the course of this litigation, Hathaway's claims and various arguments about what documents are important, which ones are key to his case, and which ones Idaho Pacific has allegedly destroyed or hidden, have changed over time and the baseless allegations against Idaho Pacific have seemed to intensify and morph to fit Hathaway's whims.  For example, although the case was initially aimed at Idaho Pacific's alleged practices of firing workers who are injured – in complete disregard of the fact that all work-related injuries or even exacerbations of personal medical issues are covered under worker's compensation insurance -- whether the employee remains employed or not – it quickly became all about the alleged missing *handwritten*, and/or signed incident report.  At trial, Hathaway then argued that Idaho Pacific destroyed the incident report, and sought a limiting instruction.  The jury was informed, over Idaho Pacific's objection, that they were to find that had the report been retained – with very little evidence that it ever existed – the jury was to presume its contents would be favorable to Hathaway.  *See* Dkt.100; *see also*

Williams Decl. Now, post-trial and just prior to the October 28, 2019 jury trial date, Hathaway

argues that he has all along demanded the metadata of the February 19, 2013[7] incident report.

The Complaint did not mention any missing incident report of any variety. The Complaint

also contains no mention of Hathaway ever signing any incident report, whether handwritten or

typed. The Complaint did allege that at least as of the time that Hathaway *first* heard there was an

issue with his incident report, that Idaho Pacific was using a *typed* report as the *official* incident

report. *See* Dkt. 1, ¶ 49.

The Complaint alleges that on or about April 17,

[D]uring his lunch hour, Hathaway asked [Dwain Gotch] to provide him with a
copy of the February 19, 2013, incident report….Hathaway's shoulder injury was
not included in the **type[d] February 19, 2013, official incident report**."

*Id*. (emphasis added). Hathaway's Complaint admits that the typed report is the official,

operative incident report, and was treated as such as of just a few weeks after his workers'

compensation claim was submitted on March 29, 2013.

At the time Hathaway says he spoke with Gotch, Gotch allegedly gave Hathaway a copy

of the official report. *See* Casperson Decl. Ex Z at p. 88-90 (Dkt. 227-21).

Hathaway then notes in his Complaint that he "contacted [Gotch] and asked why the

information was missing from the incident report." Dkt. 1 at ¶ 50. According to Hathaway, Gotch

agreed the report did not reference a shoulder injury, and instructed Hathaway to contact the

workers' compensation representative. Dkt. 1 at ¶¶ 50-51. According to Hathaway, "the

---

[7] Idaho Pacific continues to refer to the typed incident report apparently created by Dwain
Gotch on March 29, 2013 as the "February 19, 2013" incident report, or the "February" incident
report for Hathaway, as the reports are designated by date of the reported incident. *See* Casperson
Decl. at Exhibit M (screen shot of 2013 incident reports), *see also*, Higgins Depo.

representative's explanation was that the only information he had was what was included in the report, and <u>attempted to take Hathaway's copy of the report from him</u>." Dkt. 1 at ¶ 53 (emphasis added).  So, Hathaway alleges here that Idaho Pacific had given Hathaway a copy of the *typed* report, yet the inference is that the typed report was so significant, valuable, or damaging, that Idaho Pacific tried to grab the *typed* copy of the report from Hathaway's hands.

Despite Hathaway's argument that this highly relevant document is the key to his entire case, the document had not been retained by Hathaway and has not been produced to Idaho Pacific in this litigation.   It was apparently not preserved, despite Hathaway's duty to do so.

The Complaint also contains no reference to Hathaway asking Gotch about an alleged handwritten report, nor any reference about Hathaway asking about his allegedly missing signature on the report.

### E.   <u>Prior Assertions Regarding Report Creation Were Accurate</u>

Notwithstanding Hathaway's spurious argument to the contrary, Idaho Pacific and counsel did not mislead the Court, nor is there evidence that the company or counsel mislead the Court regarding the creation of the typed incident report.

In order to understand when, precisely, Hathaway's incident report was created, Idaho Pacific *and* Idaho Pacific's counsel would have had to deliberately check the metadata. Expert testimony would be needed to present the metadata to the jury.  *See, Pearson v. U.S. Bank Nat. Ass'n,* No. CIV. 13-889 MJD/JSM, 2014 WL 4163020, at *17 (D. Minn. Aug. 21, 2014).  In this case, no metadata was specifically mentioned (*i.e.* Idaho Pacific was not informed that the form of documents it turned over in discovery was deficient) until after the first trial.  *See* Williams Decl.

From Idaho Pacific's subsequent review of Dwain Gotch's incident report records, the information shows that the overwhelming majority of all 2013 incident reports were created at or

near the time of the incident – although the typed report appears to be typically created within a day or two of the incident, if not the same day.  *See id*.; Higgins Depo.  Idaho Pacific has reviewed the metadata and determined, to the extent possible to do so, that all 2013 incident reports have been maintained without edits since shortly after their date of creation.  *See id,* Jacobs Depo.

Although Hathaway is exceedingly vague in his accusation that Idaho Pacific made assertions that the Word document was *created* on February 19, 2013, the citations to the record do not support Hathaway's argument.  See, Lombardo Decl. **Exhibit 10** (Trial Transcript pp. 38, 165, 96-97, 302-305, 503, 509, 510, 636, 644, 648).

F.      **Limited, Re-opened Discovery Document Production**

This Court re-opened discovery for a limited purpose on October 24, 2019. (Dkt. 223) (this period and the entire post-trial period are the "Second Discovery Period").  As described above, Parsons Behle and Latimer counsel diligently worked to examine the discovery documents, production, and to re-create and re-produce documents within this period, where appropriate.  The attached spreadsheet shows the bates range of documents produced post-trial.  *See,* Lombardo Decl. **Exhibit 4**. It begins with the range of bates numbers (IPCSupp_000001-31) where Hathaway had asked Idaho Pacific to produce specific attachments post-trial.  *See, id*. **Exhibit 3**.  It includes the metadata reports for each time Hathaway requested metadata of a document, within the Second Discovery Period.  And it shows the ranges of all of the 2013 incident reports, produced all in native format on December 13, 2019.  Exhibit 4.

During this Second Discovery Period, Parsons Behle and Latimer counsel contacted Idaho Pacific's Corporate IT Manager Terry Jacobs, and provided instructions on searching for documents and uploading all documents to an FTP site where Parsons Behle and Latimer could directly access the documents and extract them for processing, review and production.  *See,* Jacobs

Depo. In his deposition Jacobs testified that the first time he was asked for metadata was during the Second Discovery Period. Jacobs Depo. 147:5-10.

During this time period, Hathaway requested that Idaho Pacific repeat certain searches to locate particular documents.  Idaho Pacific willingly complied, and the results of those searches were produced on December 13, 2019.  *See* **Exhibit 4**.

Jacobs also testified that there was a time during the Second Discovery Period during a search to restore Steele's emails, when he was able to locate an old hard drive, and was able to extract and restore emails which Steele believed had been previously unavailable to her.  Jacobs Depo at. 156:27.

Thus, once counsel and Idaho Pacific learned that a mistake had been made in previous document productions during the Discovery Period, the searches were re-created, including a search of "Hathaway."  See Casperson Decl. Exhibit N ([Dkt. 227-11](Dkt. 227-11)).  Had Idaho Pacific been intent on hiding or withholding these emails, the company would not have immediately turned them over when requested.  Idaho Pacific and its counsel in good faith believed that the documents and emails were all initially provided in discovery, and have supplemented the document production as soon as any deficiency was discovered.  Idaho Pacific certainly would have preferred to produce these documents during the Discovery Period.

## LEGAL ARGUMENT

## II.    **LEGAL STANDARD**

Hathaway moves for terminating sanctions "pursuant to the court's inherent power and Rule 37." Motion at 8-9 (citing *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995); *Halaco Eng'g Co. v. Castle*, 843 F.2d 376, 379 (9th Cir. 1988)). However, Rule 37 does not apply in this case, as IPC has not violated a court order—and Hathaway has not

argued to the contrary. *See Halaco Eng'g Co.*, 843 F.2d at 380 (proceeding "on the basis that the district court was exercising only its inherent powers in dismissing [the] case" because the party had not violated a court order). Accordingly, Hathaway's Motion rests solely on the Court's inherent power to issue sanctions.

The Court's inherent power to impose terminating sanctions is narrower than its power to do so under Rule 37. After all, terminating sanctions under Rule 37 relate directly to a court's responsibility to ensure that parties comply with its orders. *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980) ("Rule 37(b) of the Federal Rules of Civil Procedure provides a wide range of sanctions for a party's failure to comply with court discovery orders."). Where the court does not have this extra responsibility, there is less justification to handing down terminating sanctions. Additionally, for a court order "to constitute an order for the purposes of Rule 37," the order must "g[i]ve clear notice that the conduct found . . . would result in a dismissal of the action." *Halaco Eng'g Co.*, 843 F.2d at 379-80. That notice provides an additional justification for issuing terminating sanctions that is not present when the court is exercising only its inherent powers.[8]

Accordingly, "[t]he exercise of a court's inherent powers must be applied with 'restraint and discretion' and only to the degree necessary to redress the abuse." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). To dismiss a case pursuant to its inherent powers, "[a] district court must determine (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness,

---

[8] The Ninth Circuit has also emphasized that "[**w]here a court order is violated**," "the public's interest in expeditious resolution of litigation" and "the court's need to manage its docket" both "favor sanctions." *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) (emphasis added).

bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case, and finally, as optional considerations where appropriate, (5) the prejudice to the party victim of the misconduct, and (6) the government interests at stake." *Halaco Eng'g Co.*, 843 F.2d at 380.[9]

## III.   THERE ARE NO EXTRAORDINARY CIRCUMSTANCES TO JUSTIFY TERMINATING SANCTIONS

To justify terminating sanctions, there must be extraordinary circumstances, <u>including</u> a certain "level of contumaciousness" from the sanctioned party. *In re Rubin*, 769 F.2d 611, 618 (9th Cir. 1985). In fact, "[s]anctions interfering with a litigant's claim or defenses violate due process

---

[9] Hathaway cites the standard articulated in *Anheuser-Busch*: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanction" and "[f]or dismissal to be proper, the conduct to be sanctioned must be due to 'willfulness, fault, or bad faith.'" 69 F.3d at 348 (quoting *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 946, 948" (9th Cir.1993) (reviewing a district court's order of dismissal under Rule 37). The court addresses only the district court's inherent powers and declines to "address whether dismissal was appropriate under alternate authority of Rule 37," but in sustaining the district court's terminating sanctions order, the *Anheuser-Busch* court relies heavily on the fact that the wrongful party had consistently disregarded court orders. *Id.* at 348, 352-53. In any event, Hathaway's Motion fails under *Anheuser-Busch*—which covers most of the same considerations as *Halaco Eng'g Co. See e.g.*, *Anheuser-Busch*, 69 F.3d at 355 ("Because there is a close nexus between Beardslee's misconduct and the merits of her case, due process concerns are not implicated."). As explained below, in this case there is no bad faith and no risk of prejudice, and there are less drastic sanctions that could alleviate any harm Idaho Pacific's allegedly wrongful conduct may have caused. Likewise, there is no doubt that the fourth *Anheuser-Busch* factor favors denying Hathaway's Motion, so that his case can be heard on the merits. Finally, because no court order has been violated, it is far less clear that the first two *Anheuser-Busch* factors favor dismissal than it is in terminating sanctions cases under Rule 37. *See Computer Task Grp.*, 364 F.3d at 1115 ("Where a court order is violated, the first and second factors will favor sanctions and the fourth will cut against them.").

when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." *In re Rubin*, 769 F.2d 611, 618 (C.A.9,1985)

The Ninth Circuit has highlighted several cases where the wrongful party's conduct was sufficiently extraordinary to justify terminating sanctions. *See id.* The cases illustrate the level of complete disregard that a party must have toward the Court's orders and the judicial system to face terminating sanctions.  No comparison can be made here.  In fact, even if everything Hathaway alleges is true were accurate – which it is not – such facts would still not rise to the level of the ultimate sanction.

For example, in *Rainbow Pioneer No. 44–18–04A v. Hawaii-Nevada Investment Corp.*, the district court properly granted terminating sanctions against a party that outright ignored a court order to compel responses to discovery. 711 F.2d 902 (9th Cir. 1983). The party indicated "that it would be 'no problem' to comply with the order," but ultimately "did not produce the documents and offered no excuse for their failure." *Id.* at 904–06. Additionally, after objecting to and refusing to answer interrogatories, the party offered to make their records available but failed to do so." *Id.* at 904.

Similarly, in *Wyle v. R.J. Reynolds Industries, Inc.*, the district court appropriately granted terminating sanctions where a party "willfully failed to comply with discovery orders to produce rebating documents." 709 F.2d 585, 590 (9th Cir. 1983). The plaintiff in *Wyle* had knowingly and falsely denied that it had illegally paid rebates from January 1970 to October 1976. *Id.* at 588, 590. Plaintiff then failed to produce rebating documents, even after the court had issued multiple discovery orders commanding the plaintiff to do so. *Id.* Plaintiff's counsel even sent a telex to plaintiff's agent, forbidding the agent "to answer questions or produce documents about

[plaintiff's] rebating without authorization from a representative of [counsel]," in contradiction to the court's order. *Id.*

Likewise, in *United States v. Sumitomo Marine & Fire Insurance Co.*, the district court duly granted terminating sanctions where plaintiff failed to comply with court-ordered discovery. 617 F.2d 1365, 1367–68, 1370 (9th Cir. 1980). The court first issued a discovery order after the plaintiff's "six-month series of delays and broken promises in regard to answering . . . interrogatories." *Id.* at 1367. Then, after three additional months of inactivity and broken promises, the district court "imposed a $500 sanction" against the plaintiff's attorney for the delay and declared that it was sending "a clear and emphatic message to you . . . that I'm not going to tolerate any further such conduct by you." *Id.* at 1367-68. After eight more months and multiple additional court orders, plaintiff still failed to timely answer all of the relevant interrogatories, and even missed the deadline for responding to the motion for terminating sanctions. *Id.* at 1368.

Finally, in *G–K Properties v. Redevelopment Agency*, the district court rightly granted terminating sanctions where plaintiffs failed to produce documents despite at least three court orders to do so. 577 F.2d 645, 647 (9th Cir. 1978). (plaintiffs failed to produce documents for four months and *despite three court orders*)." Plaintiffs originally refused to produce any financial reports for the property at issue. *Id.* Then, after an initial discovery order to produce all financial reports since 1960, Plaintiffs disclosed financial reports for the years 1960 to 1968 but continued to refuse to produce any reports for 1969 or any year thereafter. *Id.* The court subsequently "directed [plaintiffs] at least twice [more] to produce the documents included in the [previous order] or to file an affidavit of a responsible officer stating that such documents did not exist and advising [defendants] what, if any, documents did contain the financial information they sought."

*Id.* But plaintiffs still refused to produce the documentation and failed to provide any responsive affidavits until after a motion for terminating sanctions was filed. *Id.*

On the other hand, in *In re Rubin*, the Court indicated that the even willful activity conducted by the relevant party does not justify terminating sanctions if the conduct does not reach the "level of contumaciousness" present in *Rainbow Pioneer*, *Wyle*, *Sumitomo Marine*, and *G—K Properties*. 769 F.2d at 618. In light of those extraordinary cases, the Court determined that a party's untimely (by fifteen days) filing of both a disputed claims statement and a set of interrogatory answers did not deserve terminating sanctions, even when coupled with the party's "refusal to make his offices available for the deposition of his custodian of records until ordered a second time." *Id.* Although refusing to follow court orders is plainly willful, the party's misconduct was insufficient to justify terminating sanctions. *Id.* Put simply, Rubin's conduct "was not egregious enough to warrant the harsh sanction of default." *Id.*

IPC's alleged conduct also lacked the egregiousness required to warrant terminating sanctions. To start, IPC has not violated any court order (willfully or otherwise), which was a significant factor in each of the cases discussed above. Moreover, as described above, IPC cooperated every time Hathaway requested more documentation—even long after the discovery period ended in this case. And in each instance, as soon as IPC realized it had an undisclosed document, it produced it to Hathaway. There is simply no evidence of contumaciousness in this case.[10]

---

[10] Opposing counsel declares that she "ha[s] never seen so many failures to provide discovery information in a case." (Dkt. 227-2). However, whether this case is the worst discovery conduct counsel has witnessed is irrelevant. A vague comparison to unidentified conduct in unidentified and unrelated cases does not and cannot demonstrate that this case warrants terminating sanctions.

Hathaway nevertheless claims that terminating sanctions are appropriate here because this case is "much like" *Connecticut General Life Insurance Company v. New Images of Beverly Hills*, 482 F.3d 1091 (9th Cir. 2007). Hathaway asserts that in *New Images* the district court's terminating sanctions were upheld "due to the defendants' failure to properly respond to discovery, including failing to provide contact information for witnesses and asserting it misplaced or lost key documents." (Motion at 9.) However, *New Images* is clearly distinguishable.

The *New Images* court found that the defendant's "pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available." *Id.* at 1097. But this pattern of deception and discovery abuse was not as Hathaway implies. The defendants in *New Images* had blatantly violated a court discovery order, doctored evidence to perpetrate a lie about when relevant bankruptcy proceedings had ended, submitted perjured declarations, hid both the locations and even the identities of relevant witnesses, and disclosed only the "first name or nicknames" of other witnesses—including several former employees—without providing any indication of how to reach them. *Id.* at 1094-95. Additionally, the district court had explicitly warned that it would "entertain a motion for terminating sanctions" if the defendants failed to "fully comply" with the discovery order. Under those circumstances, terminating sanctions were justified. There is no such justification in the present case.

As an initial matter, *New Images* was a Rule 37 case, not an inherent powers case. *New Images*, 482 F.3d at 1095. After all, IPC did not violate any court orders, as the defendants in *New Image* did. Consequently, the Court's power to impose terminating sanctions is narrower in this case than it was in *New Images*. *See Halaco Eng'g Co.*, 843 F.2d at 379-80. Moreover, IPC did not

doctor evidence, submit perjured declarations, lie about court proceedings, or engage in a sweeping campaign to hide potential witnesses.

Even if all of these assertions were true, it would still not demonstrate the level of contumaciousness required for terminating sanctions, as IPC never violated a court order and never ignored Hathaway's requests to address any perceived discovery issues.

For these reasons, there are no extraordinary circumstances justifying the harsh sanction of dismissing IPC's case.

## IV.   IPC HAS NOT WILLFULLY ENGAGED IN DECEPTIVE DISCOVERY PRACTICES OR ACTED IN BAD FAITH

In addition to lacking extraordinary circumstances, there is also no willful or bad faith conduct justifying terminating sanctions. "In cases where the drastic sanctions of dismissal or default are ordered, the range of discretion for a district court is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith." *Halaco Eng'g Co.*, 843 F.2d at 380.

Hathaway suggests that IPC's conduct was willful or in bad faith in two ways. First, Hathaway claims that "Steele managed the production of documents from IPC to legal counsel and chose not to provide significant information." (Motion at 19.) Second "[b]ased on the recently produced documents, IPC also has made false representations to the Court and the jury." (Motion at 10.) However, as illustrated above, there is no evidence that Steele chose not to provide any information to legal counsel. Nor is there any evidence that IPC made false representations to the Court and the jury.

Indeed, the evidence actually suggests that IPC acted in good faith throughout this case. As described above, IPC has taken great efforts to address every discovery request made by

Hathaway—even those that were made well after discovery was closed. IPC also turned over the metadata to Hathaway when it was directly requested—even though the request came shortly before trial. If IPC was truly trying to hide the information in the metadata, it would have no reason to turn the document when it realized that a mistake had been made.

### A.       There is No Relationship or Nexus Between IPC's Alleged Misconduct and the Matters in Controversy in This Case

Terminating sanctions are appropriate only if "the misconduct penalized . . . relate[s] to matters in controversy in such a way as to interfere with the rightful decision of the case." *Halaco Eng'g Co.*, 843 F.2d at 381. In other words, when the misconduct relates "to a peripheral matter," rather than the merits of the case, a district court may not enter terminating sanctions. *See Phoceene Sous-Marine, S. A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982).

For example, the Ninth Circuit overturned terminating sanctions in a case where a defendant "willfully deceived the court in an effort to delay trial" because "the deception related not to the merits of the controversy but rather to a peripheral matter." *Id.* The defendant had lied to the court about being too ill to attend trial, even allowing his sister to send a fraudulent telegram under the name of a doctor who had not examined the defendant. *Id.* at 804. But the Circuit court determined that terminating sanctions were inappropriate because "whether [the defendant] was in fact too ill to attend trial on October 10" was a peripheral matter that "was wholly unrelated to the matters in controversy." *Id.* at 806. Thus, "no legitimate inference regarding the merits of [defendant's] position may be drawn." *Id.*

Here, the alleged misconduct has some relationship to the merits of the case, but as demonstrated above, the vast majority of the recently produced documents are not related to the merits of this case. And, as described in greater detail below, the few documents that are related

to the merits of this case are in no way dispositive of this case. Accordingly, any misconduct from IPC did not interfere with the rightful decision in this case.

### B. Hathaway Is Not Prejudiced by the Alleged Discovery Violations

To the extent the Court wishes to consider prejudice, "[a] defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). "Whether prejudice is sufficient to support an order of dismissal is in part judged with reference to the strength of the [party's] excuse for the" wrongful conduct. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987).

### C. IPC's Conduct Has Not Impaired Hathaway's Ability to Go to Trial

The Ninth Circuit has found prejudice "when a party's refusal to provide certain documents 'forced [the opposing party] to rely on incomplete and spotty evidence' at trial." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quoting *Anheuser-Busch*, 69 F.3d at 354). On the other hand, there is a "public policy favoring the disposition of cases on their merits*,*" *Adriana Int'l Corp.*, 913 F.2d at 1412, and "a court should not go beyond the necessities of the situation to foreclose the merits of controversies as punishment for general misbehavior." *In re Rubin*, 769 F.2d at 619.

Although Hathaway claims he has been prejudiced by the IPC's alleged misconduct, he has not taken any efforts to demonstrate how his ability to go to trial has been impaired. At best, Hathaway makes sweeping claims regarding the amount of additional discovery that must be done here, but he does not identify a single line of such "necessary" discovery. Likewise, Hathaway suggests that the Court will now be subjected to "numerous motions in limine," but Hathaway makes no demonstration of what even a single one of those motions would entail.

More significantly, none of the information Hathaway cites in the recently produced documents supports the core theories of his case. For example, the creation date of the typed Report does not demonstrate that IPC fired Hathaway for unlawful purposes. (Casperson Decl., ¶ 24, Ex. P). At best, it demonstrates that any written report or notes were not formally entered into the computer until March 29. The McLean e-mail also does not support Hathaway's theory—as it suggests that Hathaway was fired in part because he asked a manager to "modify the accident report." (Depo. Ex. 19 at 29). Likewise, the Steele e-mail does not demonstrate that Steele had any knowledge that a report did not exist. Steele merely stated that she 'could not find a copy of the report." (Depo. Ex. 21). In any event, the e-mails do not demonstrate that Hathaway was fired for an improper reason. To the extent that Hathaway disagrees with this assessment, he can cross-examine McLean and Steele on these issues and allow the jury to determine how to interpret the statements.

### 1.     IPC's Conduct in This Case Was Justified

In determining whether Hathaway was prejudiced, the Court must consider whether IPC had a strong excuse for any alleged misconduct. *Malone*, 833 F.2d at 131. A review of the discovery in this case demonstrates that IPC's conduct was completely justified.

Idaho Pacific admits it made a mistake in discovery, and admits there were certain documents that should have been turned over, and should have come up as a result of its initial searches.  However, Idaho Pacific did not pick and choose what emails to provide or produce.  *See* Steel Depo.  Instead, there are many reasonable explanations for the inadvertently missed documents.  First, some were communications created after the company had provided its emails and documents to counsel to produce.  Second, as Jacobs testified, and as anyone is aware when a search for a particular email does not reveal the correct result – even when one knows the email

must be there – retrieving e-mails within Outlook Exchange, or any program, is difficult.  It is exceedingly easy to miss a few.  Third, there was a period of time where Steele found that some of her emails did not appear to be in her Outlook, or her stored PST files of emails for the Hathaway case.  When she realized this, she informed Jacobs and he investigated, and remedied at least her issue with Outlook's auto-archive feature.  Fourth, there was a period of time when Steele asked that all of her prior emails be restored for preparing for trial in this case, and a time when Jacobs could not recover some missing emails.  He was able to locate an old hard drive of Steele's in his storeroom and some of the auto-archive emails (a backup file) were recovered.  Steele may have missed printing some emails when she printed and brought them to Moffatt Thomas.  But whatever the reason, as soon as Idaho Pacific was informed that it did not produce all of the documents or that counsel wanted documents in a different format, Idaho Pacific complied and upheld its duty to supplement under Rule 26(e).

## V.      IF SANCTIONS ARE APPROPRIATE, LESSOR SANCTIONS ARE AVAILABLE AND ARE REQUIRED TO BE CONSIDERED

"Rule 37 sanctions are intended as a tool to compel production of evidence and to deter misconduct; a court should not go beyond the necessities of the situation to foreclose the merits of controversies as punishment for general misbehavior."  *In re Rubin*, 769 F.2d 611, 619 (C.A.9,1985); *see also* 4A J. Moore, J. Lucas & D. Epstein, Moore's Federal Practice ¶ 37.03[2], at 37–62 (1984).

"The consideration of less severe penalties must be a reasonable explanation of possible and meaningful alternatives." *Halaco Eng'g Co.*, 843 F.2d at 381; *see also See In re Rubin*, 769 F.2d at 617 (overturning terminating sanctions in part because "the court offered no explanation why lesser sanctions would not have been effective," while noting that "[t]he court could have

ordered that Rubin's discovery be stayed pending adequate responses to Creditors' discovery requests, or imposed monetary sanctions against Rubin, or a combination of the two").

"In ascending order of harshness, the district court may: require the delinquent party or his attorney to pay the reasonable expenses, including attorney's fees, incurred by the innocent party as a result of the failure to obey the order; strike out portions of pleadings; deem certain facts as established for purposes of the action or preclude admission of evidence on designated matters; dismiss all or part of the action; or render a default judgment against the disobedient party." *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980). Before dismissing this action, the district court must first consider each of the less harsh alternative sanctions.

The Ninth Circuit asks three questions to determine whether a district court adequately considered less harsh sanctions: "(1) Did the court explicitly discuss the feasibility of less drastic sanctions and explain why alternative sanctions would be inadequate? (2) Did the court implement alternative methods of sanctioning or curing the malfeasance before ordering dismissal? (3) Did the court warn the plaintiff of the possibility of dismissal before actually ordering dismissal?'" *Hamilton Copper & Steel Corp. v. Primary Steel, Inc.*, 898 F.2d 1428, 1430 (9th Cir. 1990) (quoting *Malone v. United States Postal Service*, 833 F.2d 128, 132 n. 1 (9th Cir.1987)). None of these questions favor terminating sanctions in the present case.

### A.    Less Drastic Sanctions are Feasible

If sanctions are appropriate in this case, lesser sanctions would effectively address the alleged misconduct. For example, the Court could require Idaho Pacific to pay for any additional discovery that may need to be done in light of the additional documents—though Idaho Pacific questions whether any additional discovery must be done.

Alternatively, the court could make a finding that the typed report was created on March 29 and prohibit IPC from arguing that the typed document was made before then. This approach would give Hathaway every benefit he could have possibly received if the metadata had been disclosed earlier and if the jury had accepted Hathaway's interpretation of that data. Significantly, the proposed finding would not be dispositive of this case. After all, a jury could still find that the typed report was just a verbatim copy of the handwritten notes prepared several weeks before. A jury could also find that Steele did not know that a typed version had not been created prior to March 29, as even in the March 28 e-mail she asserts only that she "could not *find* a copy of the report." (Depo. Ex. 21 (emphasis added).) Accordingly, there is no reason to dismiss this case, even if Hathaway is given every benefit from the most significant e-mails and metadata.

IPC sees no reason why such a finding would not remedy the alleged misconduct. And Hathaway has not discussed these alternatives at all. He simply declares that "a less drastic sanction would not cure the prejudice." (Motion at 19-20.)

### B. The Court Has Not Implemented Alternative Methods of Dealing with the Alleged Untimely Production of Documents

Here, the Court has not implemented alternative methods of dealing with the alleged untimely production of documents. In fact, Hathaway has never sought alternative sanctions for any alleged failure to timely produce documents. Accordingly, terminating sanctions in this case would be an improper and disproportionate response to Hathaway's first formal complaint about IPC's replies to his discovery requests. *See Hamilton Copper & Steel Corp. v. Primary Steel, Inc.*, 898 F.2d 1428, 1431 (9th Cir. 1990) (noting the "large gap between [curative jury instructions] and dismissal with prejudice").

**C.     The Court Never Warned IPC that it Might Dismiss the Case if it Failed to Timely Produce the Documents at Issue Here**

As has been discussed at length, unlike the vast majority of cases where terminating sanctions were deemed appropriate, IPC's alleged misconduct did not violate any court orders. Accordingly, the Court has not had occasion to warn IPC that terminating sanctions may be imposed if IPC continued to take certain conduct. This lack of warning is especially significant because IPC fully complied each time Hathaway has asked for additional discovery or asked IPC to supplement its past discovery. *See In re Rubin*, 769 F.2d at 619 ("[I]t must be noted that Rubin complied with the bulk of Creditors' discovery requests without objection.")  It would be unjust to terminate IPC's case under these circumstances. *See Malone v. U.S. Postal Serv.*, 833 F.2d 128, 133 (9th Cir. 1987) ("Failure to warn has frequently been a contributing factor in our decisions to reverse orders of dismissal."); *In re Rubin*, 769 F.2d at 619 ("The sanction was too severe to be 'just' under these circumstances.").

DATED THIS 31st day of January, 2020.

PARSONS     BEHLE     &     LATIMER

By_ */s/ Amy A. Lombardo*_____
      Amy A. Lombardo
      Brook B. Bond
      Attorneys for Idaho Pacific Corporation

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 31st day of January, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**DeAnne Casperson, Esq.**
**Amanda E. Ulrich, Esq.**
dcasperson@workandwage.com
aulrich@workandwage.com
*Attorneys for Ross Hathaway*

/s/ *Amy A. Lombardo*
Amy A. Lombardo