UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSS HATHAWAY | Case No. 4:15-cv-00086-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| IDAHO PACIFIC CORPORATION | |
| Defendant. | |

## I.    INTRODUCTION

Pending before the Court are Plaintiff Ross Hathaway's Motion for Terminating Sanctions (Dkt. 227), Defendant Idaho Pacific Corporation's ("IPC") Motion to File Excess Pages (Dkt. 236), IPC's Motion to Strike Plaintiff's Motion for Terminating Sanctions (Dkt. 238), and IPC's Motion for Leave to File Sur-Reply (Dkt. 245). Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the Motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

Upon review, and for the reasons set forth below, the Court grants Hathaway's Motion for Terminating Sanctions (Dkt. 227), grants IPC's Motion to File Excess Pages (Dkt. 236), grants in part and denies in part IPC's Motion to Strike Plaintiff's Motion for Terminating Sanctions (Dkt. 238), and denies IPC's Motion for Leave to File a Sur-Reply

(Dkt. 245).

## II.   BACKGROUND[1]

This employment discrimination case was originally filed on March 12, 2015, over five years ago. A five-day jury trial was held in mid-December 2017. The Court submitted three claims to the Jury via a special verdict form: (1) discrimination under the Americans with Disabilities Act ("ADA"); (2) retaliation under the ADA; and (3) wrongful discharge under Idaho state law. During deliberations, the Jury sent a note to the Court indicating that its members had "reached a point of aggressive disagreement." Dkt. 118, at 2. In response, the Court gave the Jury an Allen instruction.[2] The Jury then returned to its deliberations. A few hours later, the Jury sent another note to the Court stating that it had reached a "unanimous decision on only one claim" and that it was unable to agree on the other two claims. *Id.*

The Court permitted the Jury to return a verdict on the sole claim on which it was able to reach a unanimous decision. The Jury found in favor of Hathaway on the Idaho wrongful discharge claim and awarded him $34,302 in lost wages. The Jury did not answer any of the questions on the verdict form regarding the ADA retaliation claim. As to the ADA discrimination claim, the Jury determined that Hathaway had a disability and that he

---

[1] The underlying facts of the case, which are well known to the parties, have been set out numerous times in previous orders and will be discussed in greater detail as it relates to Hathaway's motion for terminating sanctions. The Court will present only a limited selection of facts here.

[2] An Allen instruction or Allen charge is a supplemental jury instruction a court gives to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation. Such an instruction has long been sanctioned. *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

was a qualified individual under the ADA. However, the Jury failed to answer any other questions regarding the ADA discrimination claim.

After several post-trial motions, the Court ultimately declared a mistrial on June 11, 2018, and ordered retrial on all claims. Dkt. 118. On May 3, 2019, Hathaway moved for leave to amend his complaint to add punitive damages on the grounds that IPC produced new evidence at trial. Dkt. 145. Finding good cause, the Court granted Hathaway leave to amend. Dkt. 204. The retrial was ultimately set for October 28, 2019.[3]

On October 24, 2019, IPC disclosed a relevant document to Hathaway for the first time. The same day, the Court held a status conference on the late disclosure. During the status call, Hathaway asked for the retrial to be vacated and for discovery to be reopened. The Court granted Hathaway's request and reopened discovery ("Second Discovery Period") for the limited purpose of Hathaway briefing the Court on the issues "specifically including, but not limited to, potential terminating sanctions and the admissibility of the late-disclosed document." Dkt. 220, at 1–2.

Hathaway subsequently filed the pending motion for terminating sanctions on January 10, 2020, based on both IPC's previous late disclosures as well as newly disclosed documents IPC had revealed during the Second Discovery Period. Dkt. 227. On January 31, 2020, IPC filed its motion to file excess pages in its response to Hathaway's motion. Dkt. 236. The same day, IPC also filed its motion to strike Plaintiff's motion for

---

[3] The retrial was originally set for set for March 18, 2019, but was then reset for June 3, 2019. Upon Hathaway's request, the June 3, 2019 trial was reset for October 28, 2019, due to Hathaway's counsel's family emergency.

terminating sanctions. Dkt. 238. On March 6, 2020, IPC filed a motion for leave to file a sur-reply to Hathaway's motion for terminating sanctions. Dkt. 245. The pending motions are now ripe.

## III.    DISCUSSION

As the subsequent motions filed by IPC affect the facts and legal arguments the Court will consider in ruling on Hathaway's motion for terminating sanctions, the Court shall review the pending motions in reverse order.

### A. IPC's Motion for Leave to File Sur-Reply (Dkt. 245)

District courts have the discretion to either permit or preclude a surreply. *See U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply") (overruled on other grounds by *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1129 (9th Cir. 2015)); *JG v. Douglas County School Dist.*, 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file surreply where it did not consider new evidence in reply).

However, surreplies "are highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Sims v. Paramount Gold & Silver Corp.*, No. CV 10-356-PHX-MHM, 2010 WL 5364783, at *8 (D. Ariz. Dec. 21, 2010) (quoting *In re Enron Corp. Sec.*, 465 F. Supp. 2d 687, 690 n.4 (S.D. Tex. 2006)); *see also Garcia v. Biter*, 195 F. Supp. 3d 1131, 1133–34 (E.D. Cal. 2016) ("The court generally views motions for leave to file a surreply with disfavor."). District courts deny motions for surreplies absent extraordinary circumstances. *See Sims,* 2010 WL 5364783, at *8 (stating

it would not permit surreplies except "in the most extraordinary circumstances") (quoting *Beckner v. Astrue*, No. 06-1012-JTM, 2007 WL 2013608, at *1 (D. Kan. July 9, 2007)); *Atlin v. Mendes*, 2008 WL 5422871 *3 (N.D. Tex. 2008) (moving party must set forth "exceptional or extraordinary circumstances warranting a surreply"); *Starr v. Cox*, 2008 WL 1914286 *2 (D.N.H. 2008) (denying "a motion for leave to file a surreply where the party failed to demonstrate that the case presented extraordinary circumstances warranting the relief sought"); *Gen. Elec. Co. v. Latin Am. Imports, S.A.*, 187 F. Supp 2d 749, 752 n.1 (W.D. Ky. 2001) ("[M]otions for surreplies . . . will be summarily denied absent extraordinary circumstances."). Typically, extraordinary circumstances are when a party raises new issues or evidence in its reply brief. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond). In those cases, the district court may allow a surreply by the non-moving party to ensure it has a full and fair opportunity to brief the issues in the case.

Ultimately, the question is whether IPC had sufficient notice of the issues in Hathaway's motion for terminating sanctions to fully and fairly brief them without a surreply brief. Here, IPC argues that Hathaway raised a new issue in his reply brief because he specifically cited to subsection (c) of Federal Rule of Civil Procedure 37 for the first time. IPC argues it had no notice under what legal authority Hathaway was seeking sanctions. Yet IPC itself noted in its surreply briefing that Plaintiff "expressly state[d] that Hathaway broadly seeks sanctions '*pursuant to the court's inherent power and Rule 37*.'" Dkt. 248, at 2 (quoting Dkt. 227-1) (emphasis added). Further, IPC knew, and Hathaway

reminded it, the Court had vacated trial and reopened discovery due to IPC's very late disclosure of a relevant document. Dkt. 227-1, at 2 (citing Dkt. 220).[4] Thus, IPC knew that Hathaway was seeking sanctions pursuant to the Court's inherent power and Rule 37 on the grounds that IPC had repeatedly and seriously failed to produce relevant documents.

IPC had sufficient notice to know, or research, the possible sanctions available under Rule 37 given the legal and factual facts Hathaway expressly described in his motion for terminating sanctions. Such sanctions include those under Rule 37(c), which is titled "Failure to Disclose, to Supplement an Earlier Response, or to Admit." Fed. R. Civ. P. 37(c). Under Rule 37(c), sanctions for failing to disclose information as required under Rule 26(a) or (e) include appropriate sanctions, such as those listed under Rule 37(b)(2)(A)(i)-(vi),[5] the very sanctions the Court also notified IPC that it could be subject to.[6]

---

[4] IPC knew that Hathaway was bringing sanctions based on its failure to produce documents. First, Hathaway stated in his memorandum supporting his motion for terminating sanctions that "[IPC's] complete failure to produce relevant and requested discovery violates Rule 37." Dkt 227-1, at 19. IPC itself stated in its opening sentence of its opposition to Hathaway's motion for terminating sanctions, that "[Hathaway] asks this Court to impose terminating sanctions against [IPC] for (1) allegedly failing to produce documents and metadata, and (2) for allegedly deceptive representations based upon the same failed disclosures." Dkt. 237, at 1.

[5] Sanctions listed under Rule 37(b)(2)(A)(i)–(vi) include:

> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party

Fed. R. Civ. P. 37.

[6] In Dkt. 220, the Court clearly instructed Hathaway that he could submit briefing "on the issue of sanctions, specifically including, but not limited to, potential terminating sanctions" such as described in Fed. R. Civ. P. 37(b)(2)(A)(iii), (v), (vi). Dkt. 220, at 2, n. 2.

IPC chose to argue in its response to Hathaway, despite knowing the above, that "Rule 37 does not apply in this case, as IPC has not violated a court order . . . ." Dkt. 237, at 17.[7] To support this proposition, it cites *Halaco Eng'g Co. v. Costle*,[8] 843 F.2d 376, 380 (9th Cir. 1988). Yet the court in *Halaco* explicitly stated that a court order was required in order for Rule 37(b)(2)(C) to apply; it did not broadly hold that a court order was always required for Rule 37 to apply. *Id.* ("We hold that no order was issued under Federal Rule of Civil Procedure 37(b)(2)(C).").

Here, Hathaway's failure to cite to the specific subsection of Rule 37 is not an extraordinary circumstance warranting a surreply. IPC knew the factual and legal grounds Hathaway was seeking sanctions under. Knowing this, if it failed to review Rule 37 prior to submitting its response to the Court, that failure rests on it. IPC filed an overlength response to Hathaway's motion, so it had more than sufficient opportunity to respond to Hathaway's grounds for moving for sanctions under the Court's inherent authority *and* Rule 37. It chose to make the legal conclusion that "Rule 37 does not apply to this case." Hathaway raised no new issues in his reply that warrant a surreply. Rather, IPC's motion seems to be a strategic effort by it as the nonmoving party to have the last word on a matter.

---

[7] The Court disagrees; IPC violated the Court's discovery order (Dkts. 9, 16). Nevertheless, for the purposes of ruling on the motion to file a surreply, the Court will proceed as if IPC is correct in its argument.

[8] The parties dispute whether *Halaco* or *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) is the appropriate framework to evaluate Hathaway's motion for sanctions. For the purposes of the motion to file a surreply, the Court assumes *Halaco* is applicable.

The Court DENIES Hathaway's motion to file a surreply.[9]

## B.  IPC's Motion to Strike Plaintiff's Motion for Terminating Sanction (Dkt. 238)

IPC moves to strike certain statements in DeAnne Casperson's declaration and a statement from Todd Higgins on the grounds that the testimony is inadmissible, citing to Federal Rule of Civil Procedure 56(e). While Hathaway's motion is technically one for terminating sanctions rather than summary judgment, IPC argues the same evidentiary principles should apply here as Hathaway's motion may lead to the termination of the entire case. Hathaway implicitly accepts IPC's framework when he argues that all of IPC's challenged statements are admissible and/or are supported by evidence in the record. The Court agrees that IPC's proposed evidentiary framework is appropriate here, where the Court may render default judgment against IPC as the disobedient party.

### 1.  *Admissibility of Statements in Casperson Declaration*

#### a.  Paragraph 22

**Granted.**

IPC objects to the language in paragraph 22 of Casperson's Declaration that states: "All of Mr. Gotch's files were accessible to any of the administrative employees, including Ms. Steele, Mr. McLean, etc." Dkt. 227-2, ¶ 22. IPC objects to the admissibility of this statement on the grounds that Casperson lacks personal knowledge of what access IPC

---

[9] Hathaway also argues that IPC's motion to file a surreply is untimely, as it was filed 21 days after he filed his reply. As the Court agrees with Hathaway that no new issues were raised in his reply to merit IPC filing a surreply, it will not comment on when a motion to file a surreply must be filed in order to be deemed timely.

employees had to each other's files. Hathaway contends the statement simply summarizes evidence for the purposes of explaining the attached exhibit.

A declarant must show personal knowledge and competency to testify to the facts stated.[10] F.R.E. 602. The Court agrees Casperson lacks personal knowledge to make this statement and grants IPC's motion to strike it from the record. The Court will determine for itself, after reviewing the attached exhibit referenced in other parts of paragraph 22, what the evidence shows.

b. Paragraph 24

**Denied.**

IPC objects to the language in paragraph 24 of Casperson's Declaration that states: "The most egregious and prejudicial emails not previously produced are set forth separately below." Dkt. 227-2, ¶ 24. IPC objects to the admissibility of the statement on the grounds that this statement is merely a legal conclusion. Hathaway argues the statement describes and introduces emails into records (and "[r]egardless, the emails speak for themselves"). Dkt. 243, at 2.

As a general rule, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). However, "[p]ure legal conclusions are not admissible as factual findings." *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010). The Court reads Casperson's statement as an opinion rather than a legal conclusion. The

---

[10] "This rule does not apply to a witness's expert testimony under Rule 703." F.R.E. 602.

Court denies IPC's motion to strike this language.

   c. <u>Paragraph 28</u>

**Denied.**

IPC objects to the language in paragraph 28 of Casperson's Declaration wherein she states: "I cannot understand how the emails and attachment were not produced except as a result of intentional exclusion by Lori Steele who is either included or was provided all of the e-mails not produced." Dkt. 227-2, ¶ 28. IPC objects to the admissibility of the statement on the grounds Casperson lacks personal knowledge to the document collection process and to the extent she has an opinion on it, it is speculation. Hathaway argues that Casperson is testifying as to her own logical conclusion after reviewing the evidence.

Casperson is stating her opinion. Her opinion is based on her personal experience reviewing the evidence in the record. The Court can weigh the credibility of her statement. It denies IPC's motion to strike this statement.

   d. <u>Paragraph 29</u>

**Granted.**

IPC objects to the language in paragraph 29 of Casperson's Declaration that states: "A simple search for Mr. Hathaway's name in Ms. Steele's email would have gathered these documents." Dkt. 227-2, ¶ 29. IPC objects to the admissibility of the statement on the grounds Casperson lacks personal knowledge to the document collection process and to the extent she has an opinion on it, it is speculation. Hathaway argues Casperson is merely reiterating testimony of Terry Jacobs found in the record.

MEMORANDUM DECISION AND ORDER - 10

The Court grants IPC's objection and will strike Casperson's statement. If relevant, the Court will analyze Terry Jacobs' statement directly in ruling on Hathaway's motion for sanctions.

e.  Paragraph 30

**Denied.**

IPC objects to the language in paragraph 30 of Casperson's Declaration that states: "I have been practicing for over 20 years and I have never seen so many failures to provide discovery information in a case." Dkt. 227-2, ¶ 30. IPC objects to the admissibility of the statement on the grounds it is irrelevant. IPC argues that "[t]he Court may grant terminating sanctions only where there has been a 'level of contumaciousness' from the sanctioned party." Dkt. 238, at 3 (quoting *In re Rubin*, 769 F.2d 611, 618 (9th Cir. 1985). As a result, IPC argues Casperson's insight into the egregiousness of IPC's conduct is irrelevant to whether its conduct did, in fact, meet this standard. Further, IPC contends Casperson's statement is inadmissible because she did not describe any of the other cases she has participated in. In response, Hathaway asserts IPC's reading of *In re Rubin* is incorrect. However, to the extent *In re Rubin* may apply, Casperson's lengthy litigation experience provides her grounds to provide an opinion on the reasonableness, or level of contumaciousness, of other parties' and counsel's conduct in discovery. Hathaway analogizes Casperson's experience similar to a judge's ability to consider his own experience when determining a reasonable attorney fee.

Casperson has considerable experience with discovery in litigation. Her statement is relevant to determining the seriousness of the potential violations and what sanctions

may be appropriate. The Court will give her statement the weight it deems appropriate.

### 2. Admissibly of Todd Higgins' Statement

**Denied.**

Todd Higgins was IPC's environmental and safety manager from the end of 2013 through October 2018. IPC objects to Hathaway's use of Higgins' testimony with regards to an email Lorinda Steele sent and moves to exclude Hathaway's statement referencing it in his memorandum supporting his motion for sanctions as well as the exhibit of Higgins' testimony.

Steele, IPC's human resources administrator, originally sent the email at issue to Higgins, Josh Rankin, and Wally Browning. In Steele's email, she informed the recipients that "Mr. Hathaway's original injury (Feb. of 2013) was reported as 'breaking down a cardboard tote; [Ross Hathaway] slipped and tried to catch himself, but his thumb caught (in the tote) and he fell, landing on his left side (this was later amended to include Mr. Hathaway's left arm was outstretched).'" Dkt. 227-9, at 16 (alterations in original).

Higgins is one of IPC's two 30(b)(6) deponents. During his 30(b)(6) deposition, Hathaway directed Higgins' attention to the above language that Steele had put in quotes in her email. Hathaway asked if Higgins knew where the quoted language came from, to which Higgins responded in the negative. At that time, IPC objected to further questioning based on speculation, foundation, and personal knowledge. Hathaway followed up with a question as to where Higgins would have expected the quoted language to come from, to which Higgins replied "[t]he incident report." Dkt. 238-1, at 4 (quoting Dkt. 239-8, at 33). Because IPC's produced incident report does not include the quoted language, Hathaway

relies on Higgins' response to support Hathaway's argument that the quoted language comes from an earlier handwritten incident report, which has never been produced.

IPC renews its objections to Higgins' statement as to where the language came from on the grounds it was speculative given he lacked personal knowledge. Hathaway argues Higgins' testimony is based on his experience at IPC as the environmental and safety manager, where he had knowledge of the policies and practices of IPC regarding safety issues, such as the contents of injury reports. Further, Hathaway relied on other testimony in arguing there was a handwritten incident report that IPC still has not yet produced.

Personal knowledge can include inductive conclusions resting on more generalized understandings of the broader context and many experiences over a period of time. For example, the Ninth Circuit has held that a manager of a restaurant had "ample personal knowledge to testify about a restaurant's normal procedures for issuing receipts to customers because the witness was the manager of a customer." *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1155 (9th Cir. 2000) (citing *United States v. Thompson,* 559 F.2d 552 (9th Cir. 1977). On the same grounds, a hospital's vice president of corporate services and former director of human resources had ample personal knowledge to testify about the hospital's practices relating to its employee insurance plan. *Id*. Higgins had sufficient personal knowledge based on his experience as environmental and safety manager to opine on where the quoted language regarding a safety incident may have come from. The Court will give Higgins' opinion the weight it deems appropriate.

The Court accordingly GRANTS in PART and DENIES in PART IPC's motion to strike as outlined above.

MEMORANDUM DECISION AND ORDER - 13

**C. IPC's Motion to File Excess Pages (Dkt. 236)**

IPC requests leave to file excess pages in its memorandum in opposition to Hathaway's motion for terminating sanctions. Dkt. 236. Hathaway filed no opposition. The Court grants IPC's motion to file excess pages.

**D. Hathaway's Motion for Terminating Sanctions (Dkt. 227)**

*1. Relevant Factual Background*

This case turns on the existence and contents of a report. Hathaway claims to have slipped on potato granules on February 19, 2013, causing him to fall and injure his left thumb, hand, and shoulder. Hathaway reported the accident to Dwain Gotch, IPC's Plant Safety Manager.

Hathaway's theory of the case is that Gotch prepared a handwritten report detailing the accident, which Hathaway reviewed and signed ("Handwritten Report"). Hathaway claims the Handwritten Report indicates that his thumb, hand, and shoulder were injured. That Handwritten Report has never been produced by IPC and IPC denies its existence. IPC contends that the only accident report that does exist is an unsigned, typed incident investigation report generated by Gotch ("Typed Report"). That Typed Report critically does not include any reference to Hathaway's shoulder injury.

About a month after Hathaway's fall, on March 21, 2013, he went to Community Care (IPC's workers' compensation provider) for shoulder pain. This pain caused his arm to seize up while he was at work. On March 22, 2013, Dr. Larry Curtis informed Hathaway he had a shoulder strain from his fall on February 19, 2013.

Steele, IPC's human resources administrator, was provided the same information on March 22, 2013. Steele believed Hathaway's pain and arm-seizure were caused by hyperglycemia. Because of this belief, she responded by telling Community Care that this injury was not workers' compensation related. On March 28, 2013, Dr. Curtis sent a letter to Steele stating he "fe[lt] strongly that [Hathaway's injury] is work comp related." Dkt 145-8, at 3.

On March 23, 2013, a day after Dr. Curtis saw Hathaway, Steele prepared a workers' compensation report ("First Report") and sent it to Liberty Mutual, IPC's insurer, along with medical documentation she had received from Community Care. In the First Report, Steele did not include any information regarding Hathaway's shoulder injury. In an email to Liberty Mutual, Steele stated she didn't know how to complete a report for Hathaway because she believed Hathaway's arm seizure on March 21, 2013, was not related to his prior work injury.

Around mid-April of 2013, a co-worker informed Hathaway that IPC omitted his shoulder injury from its records. When Hathaway inquired about the omission, Gotch provided him a copy of the Typed Report in place of the Handwritten Report. The unsigned typed report included only his thumb injury and did not reference his shoulder. Gotch told Hathaway to see Mike Willmore, another supervisor, about any concerns Hathaway had regarding the contents of the Typed Report. On April 17, Hathaway met with Willmore to discuss his concerns. On April 18, 2013, IPC fired Hathaway, claiming he told another employee he would intentionally hurt himself at work to receive compensation.

On July 22, 2015, Steele emailed Todd Higgins and two other IPC employees an email with the subject header "Idaho Industrial Commission's request for a job site eval, Ross Hathaway case." In the email, Steele wrote, "Should you need this information, Mr. Hathaway's original injury (Feb. of 2013) was reported as 'breaking down a cardboard tote; [Ross Hathaway] slipped and tried to catch himself, but his thumb caught (in the tote) and he fell, landing on his left side (this was later amended to include Mr. Hathaway's left arm was outstretched).'" Dkt. 227-9, at 16. Hathaway has argued that Steele's quoted language was pulled directly from the Handwritten Report. IPC, on the other hand, has argued the quoted language came from other sources, but has never produced documents with language that matches Steele's quote.

During Steele's deposition, Hathaway's counsel asked Steele to produce the original native file[11] of the Typed Report, as all documents, by mutual agreement, had been produced in PDF format. IPC's counsel acknowledged the request. Hathaway's counsel attests that later, during the multiple depositions taken during that timeframe, "IPC's counsel informed Hathaway's counsel that an electronic copy of the [Typed] Report could not be located." Dkt. 227-1, at 5 (citing Dkt. 227-2, ¶ 12).[12] IPC failed to provide a native

---

[11] "Native File" or "native format" "means [Electronically Stored Information ("ESI")] in the electronic format of the application in which such ESI is normally created, viewed, and/or modified. Native Files are a subset of ESI." *W Holding Co., Inc. v. Chartis Ins. Co.*, 2013 WL 1352562 at * 5 (D.P.R. Apr. 3, 2013); *see also F.D.I.C. v. Bowden*, No. CV413-245, 2014 WL 2548137, at *5 (S.D. Ga. June 6, 2014) ("Production in native format means that an electronic document [that] is a Word document, an Excel spreadsheet, an e-mail, etc., will be produced in its original format.").

[12] IPC's counsel disputes this characterization, claiming that IPC had already disclosed an electronic version of the Report, so he (IPC's counsel) would not have used that phrasing. Dkt. 237-1, Williams Decl. ¶ 8. IPC's counsel is silent on whether he conveyed to Hathaway that a copy of the Typed Report in *native* format could not be located.

version of the Typed Report to Hathaway prior to the first trial.

The first trial was held on December 11, 2017. Steele testified on the stand that she "normally" received incident reports from Gotch via email and explicitly stated Gotch had emailed her the April 2, 2013 incident report. Dkt. 127, Tr. at 413:5–414:14. Hathaway states, "[A]t the time, and in the heat of trial, this testimony did not stick out as it does now." Dkt. 227-1, at 12. IPC had never produced to Hathaway any emails from Gotch to Steele that included the Typed Report or the April 2, 2013 incident report relating to Hathaway's injuries. In other words, IPC had only produced the attached reports in non-native format and had withheld the cover emails. Prior to Steele's trial testimony, Hathaway had no reason to suspect the cover emails existed and were withheld by IPC.

Steele also testified at trial, on direct examination, she did not have any medical information before she prepared the First Report for the insurer. IPC then showed Steele an exhibit of an email she received from a member of Mountain View, the parent company of Community Care. Steele identified the email as one regarding the treatment Hathaway sought. IPC moved to admit the exhibit. Hathaway objected on the grounds that IPC was attempting to admit the cover email without its attachment: the medical records. Dkt. 127, Tr. at 423:3–424:3. As the Court wrote in its post-trial Order granting Hathaway's motion to amend his Complaint to include punitive damages:

> What is troubling to the Court is that when Steele gave this testimony, IPC had not disclosed it had received Community Care's medical reports prior to the submission of the First Report. If Hathaway hadn't made an objection, the Court would have believed the medical reports came after the First Report was submitted. Further, the Court is not as willing to attribute Steele's testimony to a lapse in memory, especially when such a mistake is easily remedied by a quick review of a few documents before trial.

MEMORANDUM DECISION AND ORDER - 17

Dkt. 204, at 9.

Additionally, IPC provided the following defenses during trial. First, no handwritten reports could be found; therefore, Hathaway's allegation that IPC had modified his signed report was false: no such report ever existed so it could not have been modified. The only incident report was the Typed Report, which IPC represented was a contemporaneous business record, prepared by Gotch at or near the time of the accident on February 19, 2013. Second, Hathaway's shoulder pain and arm-seizure were likely caused by hyperglycemia, not a work injury. Third, there was no evidence that IPC terminated or discriminated against Hathaway based on some alleged disability. In fact, during closing argument, IPC's counsel argued as follows: "And through this case, *[IPC has] produced boxes, everything that could be found except the handwritten note.* And I'll talk about that. *Every email, every document, everything.* And there is not one single document that suggests or even implies Idaho Pacific discriminated against Mr. Hathaway or terminated him because of some alleged disability." Dkt. 128, Tr. at 636:18–23 (emphasis added). IPC's closing statement was conclusively disproved—but only after the trial, nearly two years after counsel's statement was made.

While the Jury found in favor of Hathaway on the Idaho wrongful discharge claim, it was unable to reach a unanimous decision with regard to the ADA discrimination and ADA retaliation claims. On June 11, 2018, the Court declared a mistrial and ordered a retrial on all claims. The retrial was ultimately set for set for October 28, 2019.

On October 24, 2019—four days before the retrial was set to commence—IPC disclosed a critical email that included an attachment: a copy of the Typed Report of

Hathaway's injury on February 19, 2013, in native format—the electronic copy of the Typed Report which IPC had failed to disclose, despite opposing counsel's request, prior to the first trial. This was the first time IPC produced the Typed Report to Hathaway in native format. The cover letter was sent by Gotch to Steele at 8:30 a.m. on March 29, 2013. The email said:

> Lori,
>
> This is the accident report I filled out on Ross Hathaway [sic] on 2/19/13. He said the only item that hurt was his thumb nothing about his shoulder or numbness in his arm.
>
> Dwain

Dkt. 227-1, at 2 (quoting Dkt. 227-2, ¶ 14; 227-9). The metadata[13] of the attached document suggests the Typed Report was created on March 29, 2013, just minutes before Gotch sent the report to Steele.[14]

Because Hathaway had never before seen the cover email and attached document despite the fact that it was clearly relevant to his production requests, and because the

---

[13] "Metadata" means:

> (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system. Metadata is a subset of ESI.

*W Holding II,* 2013 WL 1352562 at * 1.

[14] While the parties have not provided forensic experts to examine this email and its attachment, the Court has seen the attachment in its native format and agrees that its metadata suggests to the layman's eye it was created on March 29, 2013.

MEMORANDUM DECISION AND ORDER - 19

report's metadata appeared to show that the Typed Report was created on March 29, 2013—over a month after Hathaway's fall on February 19, 2013—Hathaway immediately informed the Court that a telephonic conference was required. The same day, the Court held a telephonic conference with counsel for all parties. Hathaway stated during the conference that he was seeking terminating sanctions based on the late disclosure of the document and that he wanted the Court to vacate the trial so he could brief the issue. The Court granted Hathaway's request to vacate the trial and reopen discovery for the limited purposes of determining whether terminating sanctions were appropriate.

During the Second Discovery Period, conducted in late 2019, IPC disclosed even more emails that it had failed to produce during the original discovery period and prior to the first trial. On December 7, 2015, during the original discovery period ("First Discovery Period"), IPC responded to one of Hathaway's requests for production in the following way:

> **REQUEST FOR PRODUCTION NO. 37**: Please produce any and all documents, electronic records, emails, text messages, digital recordings, word processing files, etc., from the period of February 1, 2013, through present that in any way discuss, deal with, or relate to Plaintiff.
>
> **RESPONSE NO. 37**: Defendant IPC objects to this Request for Production on the grounds that it is vague, overbroad, and unduly burdensome. Without waiving said objections, Defendant IPC responds as follows:
>
> ***Defendant IPC has already produced all documents that in any way relate to Plaintiff's employment with IPC.***

MEMORANDUM DECISION AND ORDER - 20

Dkt. 227-1, at 3 (quoting Dkt. 227-2, ¶ 3; Dkt. 227-3)) (italic emphasis added).[15] Based on IPC's answer, "Hathaway believed IPC produced everything." *Id.*

IPC allowed Steele (a key fact witness in the case) to determine what emails were responsive to Hathaway's request.[16] Steele determined when she would reach out to her IT department (namely IPC's Corporate IT Manager, Terry Jacobs), and when she would conduct discovery independently. Dkt. 239-6, Jacobs Depo. at 32:13–16; 45:20–46:18; 49:22–25; 52:21–25. It was only in 2019, during the Second Discovery Period, that IPC counsel first contacted Jacobs in relation to this case. *Id.* at 46:7–11. This time, IPC and its counsel primarily used IPC's IT department to conduct a search for responsive documents, rather than relying on Steele. Dkt. 237, at 16. IPC counsel provided Jacobs "instructions on searching for documents and uploading all documents" to a site where IPC counsel could directly access them (*id.*), rather than its prior practice of allowing Steele to email discovery to IPC counsel (Dkt. 239-6, Jacobs Depo. 43:21–44:19; 63:18–21; 64:12–65:11). IPC's new search resulted in numerous, previously unseen, relevant documents being

---

[15] Of note, Hathaway worked for IPC for less than a year and did not have an email account, significantly reducing IPC's burden here relative to what it may have faced in a similar case where the plaintiff was a long-standing employee with his own email account.

[16] IPC does not dispute Hathaway's claim that Steele managed the production of documents from IPC to legal counsel. In IPC 's response to Hathaway's motion for terminating sanction, it quotes Hathaway's claim that "Steele managed the production of documents from IPC to legal counsel and chose not to provide significant information." Dkt. 237, at 24 (quoting Dkt. 227, at 19). IPC then states "there is no evidence that Steele chose not to provide any information to legal counsel" *Id. See also* Dkt. 239-12, at 2 (Steele emailing counsel at Moffat Thomas in November 2015, that she is "working on gathering [response] material" and will email counsel "the handbook, time sheets, job description, and other items needed—I am waiting for a summary of benefits from our worker's compensation carrier; and with regards to the Request for Production No 37—there is email communication, mostly in regards to Mr Hathaway's WC claim."); Dkt. 239-6, Jacobs Depo.65:18-19 ("Lori was in charge of managing that information and providing it to counsel.")

produced to Hathaway, as well as uncovering a hard drive of Steele's emails that she reportedly believed was unavailable to her during the First Discovery Period. Dkt. 237, at 17 (quoting Dkt. 239-6, Jacobs Depo. Dkt. 156:27).

In addition to Gotch's March 29, 2013 email with native Typed Report attachment, which was disclosed to Hathaway four days before the retrial, IPC newly disclosed other documents during the Second Discovery Period. The Court will review some of the critical documents that IPC failed to disclose during the First Discovery Period, prior to the first trial.

     a.  Emails to Steele Regarding Hathaway's Medical Visit

IPC, through Steele's discovery replies, failed to produce a responsive March 28, 2013 email that goes to the heart of the case. On March 28, 2013, at 4:20 p.m., Mountain View emailed Steele Hathaway's medical visit information and Dr. Curtis's letter explaining Hathaway's shoulder injury was related to his fall at work. Steele forward the email to Gotch and other IPC employees minutes after she received it. The email stated:

> Dwain, Steve, and Kelsey – we need to get together and discuss this ASAP as Mr. Hathaway is attempting to relate his most recent events with his previous fall at work.
>
> Dwain, I found where his fall was listed on the incidents spread sheet for Feb. 19th, *but could not find a copy of the report*, could you send that to me right away?
>
> Thank you,
>
> Lori Steele

Dkt. 227-1, at 16 (quoting Dkt. 227-13, at 1) (emphasis added). Steele stated in her second deposition that she had access to the shared files. Dkt. 228-5, Tr. at 168:13-15. Steele had looked for the incident investigation report for Hathaway's February 18 injury on March

28, 2013, but could not find it. The next day, Gotch emailed Steele the Typed Report at 8:30 a.m. The document's metadata shows the Typed Report sent to Steele was created and saved on March 29, 2013, at 8:27 a.m. Dkt. 227-9, at 14 (Dkt. 227-2, ¶ 24; Dkt. 228-3).

Neither Steele's email asking for a copy of the incident report at the heart of this case nor the email sending the requested incident report were disclosed to Hathaway during the First Discovery Period. They were also not disclosed prior to the trial, even though IPC relied on testimony during the trial which referenced the March 29, 2013 email. Steele's email stating she could not find a copy of the incident report (even though she had access to IPC's shared files), would not have even been disclosed before the *second* trial in this case, but for the Court's vacating the trial and reopening discovery.

      b.   <u>Mike Willmore's Forwarded Emails</u>

During the First Discovery Period, Mike Willmore, an IPC supervisor, forwarded Steele a cover email with the subject header "Ross Hathaway" on February 24, 2016. Dkt. 227-2, ¶ 24; Dkt. 227-16. The email itself had no body text but had multiple email attachments. All of the attached emails had some variation of "Hathaway" or "Hathoway" in their title. Steele only provided some of attached emails to IPC's counsel. Among the documents withheld was an email sent by Steve McLean, an IPC plant manager, on April 17, 2013. The email was part of a chain in which Gotch claimed that Hathaway had approached him about changing the February 19, 2013 incident report to reflect that he had hurt his shoulder. Steele forwarded Gotch's account to McLean and claimed that Hathaway had also come to her office on April 17, 2013, about the same issue. McLean responded, saying:

I think this should be the final nail in the coffin. To go and ask that the safety manager modify the accident report to tailor his modified story is not right. I talked to Lori but she said she still needed to do more research? I really don't want this guy on the property because with our luck he'll end up with a real work comp claim that we'll be dealing with for a long time to come.

I guess we'll see what Lori comes up with tomorrow *and try to get him out of here as soon as possible*. Kelsey is going to have Carrie bird dog him while he is here just to keep an eye on him and help prevent any "possible accidents" from occurring before we get to talk to him. Todd, would you want to be a part of the interview with Ross once Lori completes her homework or just have Mike, Kelsey and I handle it again?

Dkt. 227-1, at 17 (quoting Dkt. 227-2, ¶ 24; Dkt. 227-15) (emphasis added). While Steele testified that she had sent the emails Willmore had collected to IPC's counsel, there is no evidence beyond her testimony that she had done that. Regardless, the above email which discusses possible reasons IPC may have had for terminating Hathaway's employment was *never* disclosed until after the retrial was vacated.

### c.   Steele Correspondence with Mountain View

On March 7, 2016, Mountain View emailed Steele the test results from Hathaway's March 21, 2013 visit for shoulder pain. The correspondence reflected that Hathaway's blood sugar and A1C results were within a normal range during his March 21, 2013 visit. Steele, or IPC counsel, never produced this correspondence to Hathaway. Later, IPC argued during trial that Hathaway's pain was likely attributable to either hypo- or hyperglycemia. Steele also failed to produce an email correspondence she had with Mountain View on or about March 28, 2013, in which she inquired as to the time Hathaway checked in for his visit.

Hathaway had a follow-up visit with Mountain View on April 15, 2013. Dr. Curtis wrote a second letter. To this day, IPC has not produced any email or documentation related

to that visit or Dr. Curtis's second letter.[17] Whether or not Mountain View emailed Steele or another employee directly about Hathaway's visit, as it did in response to his March 21, 2013 visit is unknown. Steele claims she never received correspondence from Mountain View related to Hathaway's second visit. IPC also never produced a copy of Dr. Curtis's second letter; it is unclear if it ever received one.

### d.   Missing Handwritten Report

Hathaway contends that IPC still has not produced the missing, signed handwritten report that lies at the heart of this case. IPC contends that "Steele [] particularly and diligently" searched for the Handwritten Report but found no record of it, nor did Higgins, Gotch's successor. Dkt. 237, at 8. Hathaway has continually expressed doubts about IPC's failure to find or produce this critical record. Relatedly, Hathaway has continually asked for the document from which Steele quoted from in her email. In her deposition, Steele could not adequately explain where the quote originated from, though she has attempted to state it came from another document that does not match her above quotation. Based on his training and experience as a safety director at IPC, Higgins would have expected such language to come from the incident report. IPC has never produced a document that matches the language Steele quoted from.

Furthermore, Steele, as IPC's 30(b)(6) designee, testified that IPC took no efforts to preserve any documents. Dkt. 227-2, ¶ 9; Dkt. 227-5, at 3. It did not place in effect a

---

[17] Hathaway was able to obtain his worker's compensation file relating to IPC from Mountain View, which included Dr. Curtis' second letter and his April 15, 2013 information, via subpoena.

litigation hold to notify its employees to not destroy any documents. *Id.* at 63. There may be other missing relevant documents that have since been destroyed.

### 2. Legal Standard

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 . . . ." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Hathaway moves for terminating sanctions under the Court's inherent authority and under Rule 37.

The parties dispute what the appropriate legal standard is to apply in this case. Hathaway argues that the Court should rely on the framework provided in *Anheuser-Busch, Inc., v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). IPC argues the *Anheuser-Busch* decision is appropriate when a court order has been violated. As IPC contends that no court order was violated in this case, it proposes the Court should look to *Halaco Eng'g Co. v. Castle*, 843 F.2d 376, 379 (9th Cir. 1988)), for the appropriate standard. Both parties agree that the tests have significant overlap.

The Ninth Circuit has applied both *Halaco* and the *Anheuser-Busch* framework when reviewing whether a district court abused its discretion in applying terminating sanctions under its inherent authority. As shall be discussed below, and IPC acknowledges, *Halaco* can be essentially merged into the *Anheuser-Busch* analysis.[18]

---

[18] IPC stated that "[*Anheuser-Busch*] covers most of the same considerations as *Halaco Eng'g Co.*" Dkt. 237, at 19.

District courts have inherent power to impose sanctions, including default or dismissal, when a party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1338 (9th Cir. 1985); *see also TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987) ("Courts have inherent equitable powers to dismiss actions or enter default judgments[.]"). Terminating sanctions are a severe remedy, and should be imposed only in extreme circumstances, "where the violation is 'due to willfulness, bad faith, or fault of the party.'" *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (quotation omitted); *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (terminating sanctions are warranted where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings").

The Ninth Circuit has held that:

> [T]he most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy in such a way as to interfere with the rightful decision of the case. This rule is rooted in general due process concerns. There must be a nexus between the party's actionable conduct and the merits of his case.

*Tripati v. Corizon Inc.*, 713 F. App'x 710, 711 (9th Cir. 2018) (quoting *Halaco Eng'g Co.*, 843 F.2d at 381).

If a nexus exists, courts must weigh the following factors prior to imposing terminating sanctions: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958 (quoting *Anheuser–Busch*, 69

F.3d at 348). In most cases, the first two factors weigh in favor of the imposition of sanctions, and the fourth factor typically weighs against a default or dismissal sanction. *Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang*, 105 F.3d 521, 524 (9th Cir. 1997). "Thus the key factors are prejudice and availability of lesser sanctions." *Id.* (internal quotation marks and citation omitted); *see also Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998) (when considering evidentiary issues or terminating sanctions, factors three and five "are decisive").

While the district court need not make explicit findings regarding each of the five factors, a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper. *See Leon*, 464 F.3d at 958; *Anheuser–Busch*, 69 F.3d at 348. "Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (quoting *Valley Eng'rs*, 158 F.3d at 1058).

In comparison, *Halaco* lays out six factors a district court must consider prior to dismissing a case:

> (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case, and finally, as optional considerations where appropriate, (5) the prejudice to the party victim of the misconduct, and (6) the government interests at stake.

*Halaco Eng'g Co.*, 843 F.2d at 380. However, district courts seldom explicitly review the first condition of extreme circumstances because they generally incorporate this inquiry

into the second inquiry of bad faith. *See Halaco Eng'g Co.*, 843 F.2d at 380–81; *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1071–74 (N.D. Cal. 2006); *Sun World, Inc. v. Olivarria*, 144 F.R.D. 384, 389–91 (E.D. Cal. 1992). As seen from the discussion, supra, each of *Halaco's* factors are naturally analyzed in the *Anheuser–Busch* framework in determining whether to terminate a case. For example, in applying *Anheuser–Busch*, the district court determines whether there was willfulness, bad faith, or fault, *Halaco's* first two factors. The court also determines if due process—*Halaco's* "nexus" factor—would be satisfied by imposing the sanction. *See Anheuser–Busch*, 69 F.3d at 348. *Halaco's* remaining three factors fall under *Anheuser–Busch's* five factors.

Thus, while the Court will formally apply the *Anheuser–Busch's* framework in evaluating whether to terminate the case under its inherent authority, it will implicitly analyze the *Halcao* factors as well.

### 3. Discussion

Hathaway moves for terminating sanctions based on IPC's failure to disclose relevant documents throughout the pendency of this case. In particular, Hathaway points to IPC's failure to disclose (1) emails between Gotch and Steele regarding Hathaway's injury reports; (2) emails between Steele, McLean, and Gotch regarding Hathaway's efforts to relate his shoulder pain with his previous fall at work and Steele's inability to find a copy of Hathaway's incident investigation report; (3) emails provided by Willmore to Steele for production, including one in which the motivation for Hathaway's termination is discussed; and (4) emails between Steele and Mountain View regarding Hathaway's medical diagnosis.

a.  <u>Due Process</u>

Due process concerns "require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threaten[s] to interfere with the rightful decision of the case." *Anheuser–Busch*, 69 F.3d at 348 (internal quotation marks and citations omitted) (alteration in original). If no such relationship exists, a court cannot impose terminating sanctions.

Hathaway has long claimed that he reported his work accident to Gotch and that Gotch prepared a handwritten report that stated Hathaway injured his thumb, hand, and shoulder. Hathaway reviewed and then signed the Handwritten Report. Hathaway later suffered shoulder pain and sought worker's compensation. Hathaway then discovered that IPC's incident report omitted his shoulder injury. Hathaway inquired about the omission in mid-April 2013 and spoke with Mike Willmore, a supervisor, about his concerns about the report's accuracy on April 17, 2013. On April 18, 2013, IPC fired Hathaway, claiming he told another employee he would intentionally hurt himself at work to receive compensation.

IPC argues there is no evidence the Handwritten Report ever existed but instead disclosed the Typed Report, which was not signed and did not include the shoulder injury. Both parties agree that Hathaway approached Gotch and asked Gotch to modify the Typed Report to include the shoulder injury. The parties disagree as to what happened next. Hathaway argues that Gotch told Hathaway that someone at IPC had instructed him to omit the shoulder injury from the Typed Report and Hathaway would have to talk to the office to get it changed. IPC argues there is no evidence that Gotch was instructed to lie because

there is no evidence that Hathaway's shoulder injury was ever reported at the time of the original incident.

IPC's misconduct in this case goes directly to the heart of Hathaway's claims of whether IPC terminated him due to his worker's compensation claim and his claim that the Typed Report was inaccurate. There exists a relationship between IPC's misconduct— failure to disclose relevant documents—and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case. Indeed, had those documents been disclosed, it is possible the original trial would have been decided in Hathaway's favor.

   b.  <u>Willfulness</u>

While IPC cites to *In re Rubin* for the proposition that even willful activity does not justify terminating sanctions if the conduct does not reach a certain "level of contumaciousness," 796 F.2d at 618, the Ninth Circuit has not expressly applied that framework since the 1980s. Instead, the Ninth Circuit has held that "disobedient conduct not shown to be outside the control of the litigant is all that is required to demonstrate willfulness, bad faith, or fault." *Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1233 (9th Cir. 2006) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *Virtual Vision, Inc. v. Praegitzer Indus., Inc. (In re Virtual Vision, Inc.)*, 124 F.3d 1140, 1143 (9th Cir. 1997)); *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993) (same). Providing false or incomplete information during a deposition or in a response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal. *See Arnold v. Cnty. of El Dorado,* No. 2:10–CV–3119 KJM GGH,

2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012) (plaintiff acted in bad faith by lying at her deposition); *Lowry v. Heritage Sec.*, No. 09–CV–882–BTM WVG, 2011 WL 7769329, at *10, *14 (S.D. Cal. July 7, 2011) *report and recommendation adopted sub nom. Lowry v. Metro. Transit Bd. MTBS*, No. 09CV00882, 2012 WL 1439078 (S.D. Cal. Apr. 26, 2012) (plaintiff acted with willful disobedience in refusing to answer an interrogatory requesting his residence address, even though plaintiff refused to provide such information to protect his privacy); *see also Newman v. Brandon,* No. 1:10–CV–00687 AWI JL, 2012 WL 4933478, at *5 (E.D. Cal. Oct. 16, 2012) (plaintiff acted willfully and in bad faith in submitting falsified declarations in connection with a motion for summary judgment).

Hathaway has presented substantial and compelling evidence that demonstrates serious misconduct by IPC in this case. IPC withheld relevant and discoverable evidence by essentially cherry-picking which documents to produce in response to Hathaway's production request for documents that "in any way discuss, deal with, or relate" to Hathaway and then by asserting all documents that "in any way relate to Plaintiff's employment with IPC" had been produced. Dkt. 227-1, at 3. IPC also represented to the Jury that all documents had been produced, even though a least some of the documents IPC testified about, even on the stand, were *not* produced to Hathaway. By doing so, IPC misled Hathaway, the Court, and the Jury that it had complied with its Rule 26 obligations and that all relevant evidence was submitted to the Jury. This prevented Hathaway, the Court, and the Jury from learning the truth about the circumstances surrounding the termination of Hathaway's employment.

It is particularly troubling to the Court that but for the hung jury in the original trial, these documents would never had been disclosed. Further, IPC only voluntarily disclosed one of the documents at issue prior to the *second* trial—the cover email from Gotch to Steele that attached the Typed Report.[19] The Typed Report itself was originally requested in native format by Hathaway during a deposition prior to the first trial. Not only did IPC fail to turn over the Typed Report in native format, IPC also *never* produced the cover email prior to October 24, 2019, even though Steele testified that she normally received such emails containing incident reports from Gotch during the first trial. All of the other documents—the emails from Willmore to Steele, the correspondence between Steele and Mountain View regarding Hathaway's medical diagnosis, and the email in which Steele stated she could not find a copy of the incident investigation report—were not disclosed until the Court ordered the limited reopening of discovery for the purpose of determining whether terminating sanctions should be imposed.

All of the newly disclosed documents include "Hathaway" or "Hathoway" (a known misspelling of Hathaway's name)[20] in the document title, subject line, or body of text. All are clearly relevant to the case. Further, Steele was primarily responsible for conducting IPC's discovery. She gathered and emailed to IPC's counsel documents in response to discovery requests. Dkt. 237, at 10. She conducted the searches and chose when to ask

---

[19] Again, while IPC had disclosed the Typed Report in PDF format prior to the first trial, it had not produced it in native format, as requested by Hathaway's counsel during Steele's first deposition.

[20] IPC knew that Hathaway" was misspelled as "Hathoway" in relevant documents. Todd Higgins, Gotch's replacement as safety director, even testified in his deposition that he searched for both spellings during the 2015 discovery process. Dkt. 237, at 8.

others at IPC for help discovering information to disclose. Employees emailed her relevant documents to produce to Hathaway. Steele was a recipient or a sender of all the emails IPC failed to disclose. All of the emails IPC failed to produce were directly related to Hathaway's employment and the case.

The Court cannot simply say that Steele's, and thus IPC's, failure to disclose such important documents in this case by a person who played a crucial role, both during discovery and as a fact witness, was merely a "mistake."[21] Dkt. 237, at 17. This is especially true because at least one of the documents IPC failed to disclose was an email of an incident report from Gotch—an email Steele testified on the stand was the kind she "normally" received (and thus should have known to look for). Further, Steele produced some of the emails Willmore forwarded her, but withheld others. This implies that she made a conscious choice *not* to produce relevant information and to not disclose to Hathaway that IPC would withhold them.[22]

Additionally, IPC has withheld or obfuscated information from Hathaway and the Court on prior occasions. As previously stated, the Court allowed Hathaway to amend his

---

[21] One of the excuses IPC provides is that Jacobs, the IT manager, located during the Second Discovery Period an old hard drive from which he was able to extract and restore emails "which Steele believed had been previously unavailable to her," and thus not produced during the First Discovery Period. Dkt. 237, at 17. IPC said once it and its counsel learned of its mistake, they recreated the search. IPC does not explain why it took until the *Second* Discovery Period for Jacobs to locate the hard drive. Nor do they contend that Steele asked Jacobs for his help locating the hard drive or recovering Steele's "unavailable" emails during the First Discovery Period. Thus, IPC was not diligent during the First Discovery Period. Further, such an excuse does not explain why the cover email to the Typed Report was not disclosed during the First Discovery Period, particularly as Steele represented on the stand that Gotch typically emailed her such reports.

[22] IPC did not produce a privilege log or make claims of privilege over the withheld documents. IPC simply failed to disclose the documents without notifying the Court or the opposing party it was doing so.

Complaint to include punitive damages after Steele gave her testimony on the stand implying that she submitted the First Report to the insurers before receiving medical reports. When she gave that testimony, IPC had not disclosed it had received Community Care's medical reports *prior* to the submission of the First Report. Hathaway objected, and a quick review of the documents made clear that Steele's testimony was inaccurate. In granting Hathaway's motion to amend his Complaint, the Court was clear it was not willing to attribute Steele's testimony to a lapse in memory, especially when such a mistake was easily remedied by a quick review of a few documents before trial. Dkt. 204, at 9.

Additionally, during discovery, Hathaway requested Margaret Johnson's contact information. Margaret Johnson was Hathaway's co-worker at IPC and allegedly heard Hathaway say that he should trip and fall so IPC would have to pay a worker's compensation claim. IPC indicated in its initial disclosures that it did not have the address for Johnson. Later, in its supplemental disclosures, it gave Hathaway a P.O. Box number for Johnson located in Ririe, Idaho. Finally, apparently after Hathaway made several attempts to obtain information from IPC, IPC gave Hathaway a phone number for Johnson. The number was no longer in service. Hathaway was never able to contact or depose Johnson during discovery. A year after discovery closed, IPC asked to take a trial deposition of Johnson and indicated it had obtained Johnson's contact information via a private investigator.

The Court denied IPC's request. It held that:

"IPC was not diligent. During discovery, IPC made minimal efforts to locate or contact Johnson. IPC has given no explanation as to why it did not hire an investigator during discovery to locate Johnson or why it did not take other

steps during discovery to locate her. And, as explained above, IPC failed to even timely supply Johnson's contact information to Hathaway."

Dkt. 48 at 9. The Court ultimately concluded that "Hathaway has never had the opportunity to cross-examine Johnson because of IPC's dilatory conduct," so—as a remedy for IPC's inadequate discovery—it was appropriate to exclude Johnson as a witness in order to cure the prejudice to Hathaway. Dkt. 48, at 15.

IPC again has been dilatory in its discovery. Had IPC not been required to disclose the recently produced documents, the evidence would not reflect that there was cause to question whether IPC's Typed Report of the incident was created contemporaneously to the event, that Steele knew Hathaway's blood sugar levels were normal when he visited Mountain View (thus undermining IPC's claims that he suffered from hypo- or hyperglycemia), or that IPC considered Hathaway's attempt to modify the Typed Report in its decision to terminate his employment. As the evidence now shows, Hathaway's case is considerably stronger than what he was allowed to present to the Jury. Further, IPC's patterns of dilatory discovery, withholding documents, and misconstruing the record over the many years of this case are deeply troublesome. Under these circumstances, it is difficult for the Court to see how IPC's conduct merits anything less than the imposition of severe sanctions.

The Court finds that because IPC withheld evidence it knew was relevant to the litigation through the entire first trial—and was prepared to do so through the second trial—its actions were, at best, willful or, at worst, in bad faith. Because IPC's repeated, intentional actions of violating Rule 26—and the Court's discovery order—establish the

willful conduct necessary for the imposition of terminating sanctions, the Court proceeds to consider the five factors of *Anheuser–Busch* below.

> c. The Public's Interest in Expeditious Resolution of Litigation, the
> Court's Need to Manage its Dockets, and Public Policy Favoring
> Disposition of Cases on Their Merits

The first and second factor of the *Anheuser–Busch* analysis are typically reviewed together. A desire for prompt resolution of cases weigh in favor of the imposition of sanctions. "The public and this Court have an interest in securing the just, speedy and inexpensive determination of all actions[.]" *Bump Babies Inc. v. Baby The Bump, Inc.*, 2011 WL 5037070, *6 (C.D. Cal.), *report and recommendation adopted*, 2011 WL 5036919 (2011) (internal quotation marks and citation omitted). "Orderly and expeditious resolution of disputes is of great importance to the rule of law. By the same token, delay in reaching the merits . . . is costly in money, memory, manageability, and confidence in the process." *PPA Prod. Liab. Litig.*, 460 F.3d at 1227; *see id.* at 1234 ("Sound management of the court's docket also counsels in favor of sanctions as a deterrent to others[.]").

The first and second factor support case termination when the destruction, or failure to disclose, evidence "obscure[es] the factual predicate of the case and consum[es] months of sanction-related litigation." *Leon*, 464 F.3d at 958 n.5. As previously discussed, IPC's failure to disclose the newly produced documents obfuscates the very heart of the matter in dispute. The Court has also already spent significant time investigating and resolving IPC's dilatory discovery and disclosures. The first two factors support case termination. *Id*.

The fourth factor, the public policy favoring disposition on the merits, "always weighs against the sanction of dismissal." *BNSF Ry. Co. v. Quad City Testing Lab.*, 2009

WL 1067824, at *4 (D. Mont. 2009). Because factors one and two support sanctions and four "cuts against case-dispositive sanctions," factors three and five—the prejudice suffered by the party moving for sanctions and the availability of less drastic sanctions— "are decisive." *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

### d.  Risk of Prejudice to the Hathaway

A party "suffers prejudice if the [opposing party's] actions impair the [party's] ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Internat'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). Prejudice is evident, for example, when there is a "pattern of deception and discovery abuse" that "make it impossible for [a court] to be confident that the parties will ever have access to the true facts." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hill*, 482 F.3d 1091, 1097 (9th Cir. 2007) (citing *Valley Eng'rs Inc.,* 158 F.3d at 1058.

In *Valley Engineers Inc.*, the Ninth Circuit affirmed an award of terminating sanctions because there was evidence to establish the defendant knew about a damaging and "exceedingly important" memorandum but intentionally withheld it, denied its existence, and violated court orders to produce it for more than two years. 158 F.3d at 1053–1058. Under those circumstances, the Ninth Circuit concluded that a case dispositive sanction was appropriate, because the defendant "so damage[d] the integrity of the discovery process that there [could] never be assurance of proceeding on the true facts . . . ." *Id.* at 1058–1059. The Ninth Circuit has also held that "[e]ven a single violation of a discovery order can be justification for dismissing a case . . . if critical documents are being

withheld, and the integrity of the entire process is called into question." *In re Hurt*, 210 F.3d 383 (9th Cir. 2000). "Failure to produce documents as ordered . . . is considered sufficient prejudice." *Adriana Internat'l Corp.*, 913 F.2d at 1412. "Late tender is no excuse." *In re PPA Prods. Liab. Litig.*, 460 F.3d at 1227.

IPC insists over and over that it has never violated a court order, willfully or otherwise. Instead, it argues that it has cooperated every time Hathaway requested more documentation.[23] To wit, IPC produced "well over 784 bates-stamped pages" after the first trial was held in the case. Dkt. 237, at 4. IPC contends that most of the documents only became relevant and responsive after trial, since they are related to the initial discovery process, rather than to the claims or defenses of the lawsuit itself. It argues it "only mistakenly failed to locate about 45 documents" during the First Discovery Period. *Id*. at 5. IPC further contends that only a few of those documents are arguably substantive and "virtually zero are prejudicial to Hathaway." *Id*.

The Court disagrees with IPC's premise that it has complied with every court order or the rules governing civil procedure. If every party could fail to disclose key documents requested for production by the discovery order deadline; represent to the opposing party,

---

[23] It appears as if IPC is blaming Hathaway for its own dilatory discovery. In essence, IPC implies that if only Hathaway had explicitly requested that it produce the newly disclosed documents at an earlier time in this case, *then* it would have had cause to disclose the documents. As IPC represented to Hathaway it had produced all of the material Hathaway requested, the Court does not see how Hathaway could have known to ask for the documents again. Hathaway relied on IPC's representation that it had comported with Rule 26, followed the Court's discovery order, and that its responses to Hathaway's production requests were truthful. Furthermore, Hathaway should not have had to keep requesting responsive documents from IPC in order to get IPC to comply with its obligations. IPC's avowed "compliance" in producing documents when Hathaway asked is of marginal significance when it should have complied of its own accord years ago.

a jury, and the trial court that all requested documents had been produced; and then, after trial ended, produce those key documents but argue it had not violated any rules in hiding the information, no one would trust the judicial process. Indeed, those actions, by definition, impair a party's ability to go to trial and likewise interfere with the rightful decision of the case. IPC failed to comply with the Court's discovery order (Dkts. 9, 16), and failed to comply with Federal Rule of Civil Procedure 26.

With each discovery violation, IPC prejudiced Hathaway's ability to prepare for and try this case. The Court's deadline for fact discovery completion was September 30, 2016, (Dkt. 16), yet IPC incompletely produced responses to document requests and hindered the deposition of a key witness. As the Court has discussed in detail above, it finds the tardily disclosed documents were both substantive and highly relevant to Hathaway's claims and IPC's defenses. The Court finds that IPC's conduct prejudiced Hathaway's ability to pursue his claims and hampered the search for truth, and that IPC's actions were particularly harmful given the fact that trial commenced without the necessary disclosures and the retrial *would* have proceeded without the incredibly late disclosure of a critical document. *See N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (endorsing district court's finding that "willful violation of the discovery order had, given the imminence of the trial date, prejudiced [the other party's] ability to prepare for trial").

    e.  <u>Availability of Lesser Sanctions</u>

A court "must, before dismissing an action under its inherent powers, consider less drastic sanctions." *Halaco*, 843 F.2d at 381. This requires "a reasonable explanation of possible and meaningful alternatives," *id.*, though "[t]he district court need not exhaust

every sanction short of dismissal before finally dismissing a case . . . ." *Henderson v. Duncan,* 779 F.2d 1421, 1424 (9th Cir. 1986). In conducting the lesser sanctions inquiry, the court examines the following factors: (1) the feasibility of less drastic sanctions and why alternative sanctions would be inadequate; (2) whether alternative methods of sanctioning or curing the malfeasance were implemented before ordering dismissal; and (3) whether the party has been warned of the possibility of dismissal before actually ordering dismissal. *See Malone*, 833 F.2d at 132; *Anheuser–Busch*, 69 F.3d at 352; *Leon*, 464 F.3d at 960.

What is most important for case-dispositive sanctions is whether the misconduct "threaten[s] to interfere with the rightful decision of the case." *Valley Engr's Inc.*, 158 F.3d at 1057; *see also Anheuser–Busch*, 69 F.3d at 348 (holding that terminating sanctions are available when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings"). Where a court cannot conduct a trial with reasonable assurance that the truth would be available, dismissal is appropriate. *See Brown v. Oil States Skagit Smatco,* 664 F.3d 71, 79 (5th Cir. 2011) (affirming district court's determination that dismissal was the only appropriate sanction where a plaintiff lied at deposition); *Arnold,* 2012 WL 3276979 at *15 (holding that lesser sanctions would not be appropriate where a plaintiff repeatedly lied at deposition and refused to comply with discovery obligations); *Knapp v. Convergys Corp.,* 209 F.R.D. 439, 443 (E.D. Mo. 2002) (finding that lesser sanctions, such as monetary sanctions or re-opening of discovery,

would not repair the harm to defendants caused by plaintiff's false responses to interrogatories).[24]

The Court finds that less drastic sanctions would not be useful here because defendants have "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser–Busch*, 69 F.3d at 348. Lesser sanctions will not address the harm caused by IPC's repeated disclosure failures. IPC's misconduct interfered with the rightful decision of the case. A trial has already been held. The trial was the culmination of almost three years of litigation and cost substantial attorneys' fees to complete. The preparations for the retrial have already taken over two years so far. If the retrial were to actually occur, the Court would need to reopen discovery beyond the limited purpose of determining whether there should be terminating sanctions. It would have to reopen discovery entirely to ensure IPC fulfills all of its disclosure obligations. This would push back the retrial date even further. After five years, the facts are stale. Key witnesses are either in poor health or have not worked for IPC in years. Hathaway was due the newly disclosed information during the First Discovery Period, well before trial. Lesser sanctions will not compensate Hathaway for the significant time and money that he has invested nor—given the age of this case—will it put him in the same situation he would have been if he had been able to access to the newly disclosed material years ago.

---

[24] Most motions concerning terminating sanctions involve misconduct by the plaintiff. In those situations, dismissal is appropriate. Where, as here, misconduct involves the defendant, it is appropriate to find liability in the plaintiff's favor rather than dismissing the case in its entirety.

IPC's repeated and consistent dilatory and incomplete discovery in this case makes it impossible for the Court to have confidence in IPC when it says it has disclosed everything. Lesser sanctions will not restore the credibility of IPC with regard to its compliance with Rule 26. There will always be a shadow over the trial about what other documents IPC may have withheld or destroyed. This is particularly the case given that a critical fact for both parties concerns the existence and contents of the Handwritten Report. Case termination is the only meaningful sanction available to the Court at this late juncture.

Whether or not the district court warned a disobeying party of the possibility of dismissal is relevant, but "an explicit warning is not always necessary" for a dismissal order to be proper. *Anheuser-Busch, Inc.*, 69 F.3d at 535 (citing *Adriana Int'l Corp.,* 913 F.2d at 1413). As the Ninth Circuit explained in *Valley Engineers Inc.*, "the central factor in evaluating the district court order [of terminating sanctions] is justice, and everyone has notice from the text of Rule 37(b)(2) that dismissal is a possible sanction for failure to obey discovery orders." 158 F.3d at 1056–57. The five-part *Anheuser-Busch* test is used "to determine whether a dismissal sanction is 'just,'" but notwithstanding the fifth factor, "it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning." *Id.* at 1057 (characterizing the five-part test as "a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything").

Here, IPC is wrong that it has never violated any court orders in failing to disclose documents. It violated the Court's discovery order, which mandated all discovery be completed by September 30, 2016. Dkts. 9, 16. That said, the Court did not learn about

IPC's failure to withhold a critical document until October 24, 2019, a few days before retrial. At that time, the Court explicitly warned IPC both verbally and in writing that IPC's discovery conduct could result in serious repercussions, including terminating sanctions. The Court reopened discovery and invited briefing on the issue. The issue has now been briefed, IPC has an opportunity to be heard, and the Court finds IPC had sufficient notice under *Anheuser-Busch* that termination sanctions were possible.

### f. Anheuser-Busch Conclusion

The Court has carefully evaluated of all the *Anheuser-Busch* factors and found IPC's discovery noncompliance—not only recently, but throughout the pendency of this litigation—to be the result of willfulness, fault, and/or bad faith, and that the misconduct relates to the merits of the case.[25] Like the *Anheuser-Busch* court, the Court finds it has grounds to impose terminating sanctions under its inherent power. Therefore, it need not address whether dismissal is appropriate under the alternate authority of Rule 37.[26] *Anheuser-Busch*, 69 F.3d at 348 ("We therefore need not address whether dismissal was appropriate under the alternate authority of Rule 37.")

The Court enters a default judgment against IPC.

---

[25] The Court does not intend to implicate IPC counsel in wrongful conduct. Given the record and motions in currently front of it, the Court faults IPC, not its counsel, for its discovery noncompliance.

[26] Both parties either assume or argue that IPC has not violated a court order. The Court disagrees. However, under the parties' assumption that no court order was violated, the parties dispute whether the Court has the authority to impose terminating sanctions under Rule 37(c). Here, the Court finds it has the power to impose terminating sanctions under its inherent authority so it need not evaluate either party's interpretation of Rule 37.

A jury shall decide at a later time what damages Hathaway is owed. *See Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1165 (9th Cir. 2012) (reversing and remanding back to a jury trial the question of punitive damages where the district court had entered default judgment and held a jury trial on non-punitive damages).

### IV.ORDER

IT IS HEREBY ORDERED:

1) Plaintiff Hathaway's Motion for Terminating Sanctions (Dkt. 227) is **GRANTED.**

2) Defendant IPC's Motion to File Excess Pages (Dkt. 236) is **GRANTED**.

3) Defendant IPC's Motion to Strike Plaintiff's Motion for Terminating Sanctions (Dkt. 238) is **GRANTED** in **PART** and **DENIED** in **PART**.

4) Defendant IPC's Motion for Leave to File a Sur-Reply (Dkt. 245) is **DENIED**.

5) A jury trial shall be set at a later date to determine what damages Hathaway is owed.

DATED: June 2, 2020

David C. Nye
Chief U.S. District Court Judge